[No. S004666. Crim. No. 24475. Apr. 2, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
FRED BERRE DOUGLAS, Defendant and Appellant.

## COUNSEL

Amitai Schwartz, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard D. Iglehart, Chief Assistant Attorneys General, Harley D. Mayfield, Assistant

Attorney General, Michael D. Wellington, Robert M. Foster and Pat Zaharopoulos, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

LUCAS, C. J.—Defendant Fred Berre Douglas appeals from a judgment imposing death following his conviction of two counts of first degree murder (Pen. Code, § 187 et seq.; all further statutory references are to this code unless otherwise indicated), accompanied by the special circumstance finding of multiple murder (§ 190.2, subd. (a)(3)) in connection with the 1982 killings of 19-year-old Beth Jones and 16-year-old Margaret Kreuger. We affirm the judgment in its entirety.

### I. FACTS AND PROCEDURE

#### A. *Guilt Phase Evidence*

The case against defendant was based substantially on the testimony of his accomplice, Richard Hernandez, who was granted immunity from prosecution in exchange for his testimony. Another witness, Kathy Phillips, also testified for the prosecution pursuant to a promise of immunity. Hernandez's and Phillips's statements were substantially corroborated by physical evidence and other witnesses.

#### 1. *Phillips's Testimony*

In 1979, Phillips, a heroin addict, wanted money to buy drugs. Her friend, Richard Hernandez, worked next door to defendant's furniture refinishing shop in Santa Ana. Hernandez often supplied Phillips with drugs. He introduced Phillips to defendant, who told her he would pay her if she posed for nude photographs while in bondage. Phillips agreed to pose for defendant and shortly thereafter defendant took her to his shop, where he tied her hands and ankles and gagged her mouth. According to Phillips, defendant showed her photographs of several other women to indicate how he wanted her to pose. He also instructed her to "look scared" but did not harm her during the photo session. Defendant paid Phillips $40 after he had taken pictures of her with a Polaroid camera for about an hour. Phillips eventually left the shop with Hernandez, who then purchased drugs for her.

Two weeks after the above incident, defendant asked Phillips if she would assist him in killing young women in the desert while making sex films that

included bondage, sadism and homosexual scenes. Defendant believed that Phillips's presence during the filming would make it easier for the victims to trust him—thus making his crime easier to commit. According to Phillips, defendant told her he would bury the bodies so that no evidence would be discovered and that he would make a lot of money (around $35,000) by selling the films to "people in Las Vegas."

Phillips testified that although her drug habit kept her from going to the police, she told defendant she did not want to participate in the crimes. She also stated she continued to frequent defendant's furniture shop even after his proposition because she was dependent on Hernandez to supply her with drugs.

About a month after defendant attempted to enlist Phillips as an accomplice in his sex-and-murder film scheme, Phillips went to defendant's shop in order to meet Hernandez. She instead encountered defendant, who asked her "what she was going to do" about his earlier proposition. On another occasion, Phillips said defendant called her to tell her he "had a woman with him" and wanted to "carry out his plan." Phillips told defendant she did not want to be part of his scheme. Her contact with defendant ended when she was convicted of burglary and sentenced to county jail for one year.

### 2. Hernandez's Testimony

Hernandez began working for defendant at his furniture refinishing shop in 1981. He was paid in food, beer, lodging and occasional spending money. He lived in defendant's boat that was parked behind the shop. Hernandez drank beer throughout each day. After Hernandez had been working for defendant for almost eight months, defendant asked him to have a coworker drive Hernandez to his house in Costa Mesa. When Hernandez arrived, he saw an unconscious naked woman lying on a sofa bed in the living room. Defendant told Hernandez he had drugged the woman. He instructed Hernandez to take off his clothes so he could take pictures of Hernandez with the woman. Hernandez removed his clothing, and posed with the woman. Defendant told Hernandez to insert a baton inside the woman's vagina, but it would not fit. Instead, Hernandez put butter on the object and inserted it inside her rectum. Defendant then told Hernandez to place his penis in the woman's mouth so that defendant could take a picture. When the woman awoke three days later, defendant and Hernandez let her go.

On the day of the murders the two victims met defendant and Hernandez in a 7-Eleven parking lot. The foursome drove, in defendant's car, to the

desert south of Indio.[1] During the drive, Hernandez drank beer, and he and Kreuger smoked marijuana. When they arrived at the desert, Kreuger and Hernandez smoked more marijuana, and Hernandez followed defendant's instructions to lay a sheet on the ground and prepare rum and Cokes for the four of them.

After the foursome relaxed for an hour, defendant instructed the victims to remove their clothing. Kreuger asked defendant if she could see the money, and defendant showed her a $100 bill. Defendant then gave Hernandez a rope (which, Hernandez testified, was "a bit thicker than venetian blind cord") and told him to tie up the victims. Hernandez tied their feet at the ankles and then tied their hands behind their backs. When Kreuger asked defendant where he kept the camera, he and Hernandez walked to the car, where defendant retrieved a rifle from the trunk. Hernandez testified that he became scared when he saw the gun. On returning to the victims, defendant put a clip in the rifle and told them "[h]ere's the camera." He then told the victims to "make love to each other."

Hernandez testified that for the next 10 to 15 minutes, defendant paced back and forth, shouting instructions first to one victim, and then to the other. He ordered one victim (Hernandez could not remember whether it was Jones or Kreuger) to kiss the other's feet, and then stated he wanted "some tongue on her crotch." When the victims requested a drink, Hernandez gave them each a sip of soda. Hernandez recalled that he continued to drink alcohol during the time defendant was shouting instructions to the victims, because he was "afraid of defendant."

Hernandez testified that after he gave the women a drink, defendant cut Kreuger on the neck with a razor blade and sucked on the open wound for about 10 minutes. When defendant stopped sucking the cut, he retrieved a beer from the cooler and told Hernandez that the women "just couldn't go back."

Thereafter, defendant told the victims to suck on his penis, while they remained in a kneeling position. The victims next began to orally copulate Hernandez. When he was unable to sustain an erection, he told defendant that he had to urinate. As he squatted to defecate behind a bush, Hernandez heard one of the victims yell "Leave her alone!" Hernandez stated that as he walked back toward the victims, he saw defendant choking Jones. He also noticed that Kreuger was dead, blood spurting from her mouth. Hernandez claimed he attempted to knock defendant off of Jones, but that defendant

---

[1] Several months before the murders, defendant told Hernandez he wanted to find a place in the desert to take pictures of naked girls. Hernandez testified that the two men drove to the desert near Indio, and eventually found a satisfactory spot between two hills.

knocked him down instead. According to Hernandez, he was too "messed up," after using drugs and drinking beer, to stop defendant. After choking Jones, defendant hit her with the wooden butt of his rifle, killing her.

Defendant then told Hernandez that the heat was bothering him, and he wanted to get a drink at a bar in town. Hernandez covered the victims with a sheet and hid their bodies behind a bush before the two men went to a bar in Borrego Springs, where they consumed several drinks each. When they returned to the desert, defendant told Hernandez to untie the ropes and to remove all jewelry from the victims (along with anything else that could be used to identify them). Defendant told Hernandez the items would be thrown away on the trip back to Orange County. He also told Hernandez to dig a grave and to bury the bodies. Defendant then left the scene for an hour while Hernandez followed his instructions. When defendant returned to the desert, the two men drove to Borrego Springs where they placed the sheets, ropes and the victims' clothing in a dumpster behind a market. The men then drove back to defendant's shop.

The next day, defendant instructed Hernandez to return to the murder site to find the razor blade that he used to cut Kreuger's neck. Hernandez did as he was told, but failed to find the blade.

When Hernandez returned to the shop, he found it locked. Defendant told him that someone had called the shop and asked for "Jack" and that unknown persons had tried to "break in." Defendant instructed Hernandez that if the "burglars" returned, he was to call the Garden Grove police at a certain number. Defendant then gave Hernandez a rifle and told him, "Anybody comes, shoot at them." According to Hernandez, defendant told him to sleep on a "glue table" inside the shop.

After defendant left the shop, a woman called and asked for "Jack." Later that evening, Hernandez called the police after he was awakened by a noise on the roof. According to Hernandez, at least one officer believed that those attempting to break into defendant's shop were angry over a "drug burn."

The next day, Hernandez and defendant were questioned at the Garden Grove Police Department about the disappearances of Kreuger and Jones. Hernandez recited an alibi that defendant had concocted a few days before the murders, telling the authorities that on the day of the murders the two men spent the day fishing in Oceanside and then traveled to Corona to search for Hernandez's brother, whom they never found. That evening, defendant and Hernandez drove north, arriving several days later in Victoria, Canada, where they both obtained employment at Strong's Furniture

Refinishing Shop. Approximately six weeks later, defendant told Strong he was leaving for Seattle to seek medical attention for gout in his leg. Instead, defendant and Hernandez drove to Reno, Nevada, where they bought a car in order to trade its license plates with those on defendant's car. Two days later, they drove to the murder site to check the grave.

Toward the end of 1982, defendant and Hernandez returned to Victoria with a man named "Bob." Defendant instructed Bob to provide Hernandez food and shelter. Defendant then left, his destination unknown to Hernandez. While in Canada, Hernandez was questioned by Canadian detectives about the disappearance of the victims, on several occasions. At one point, Hernandez declined offers of immunity and Canadian citizenship in exchange for his testimony.

The bodies of Kreuger and Jones were discovered in the Anza-Borrego National Park by a photographer and his wife during the 1983 Easter holidays. Once the burial site was excavated, police collected human teeth, hair, barrettes and bones. Forensic odontologist Norman Sperber examined the skulls found at the site and two weeks later the skeletal remains were matched with the victims' dental charts and X-rays.

Meanwhile, Hernandez had returned to Orange County. After defendant and Hernandez discovered that the grave site had been disturbed, and that warrants had been issued for their arrest, they traveled to Loreto, Mexico. Defendant left Loreto after spending three weeks hiding from the authorities. Hernandez stayed in the city for approximately 10 months before he was taken into custody by Mexican authorities, who had been told by American police detectives (Johnson and Martinez of the Anaheim Police Department) that Hernandez was wanted in the United States. Apparently, as discussed further below, before he spoke to the American officers Hernandez had confessed the murders to the Mexican authorities after they beat him. Hernandez was then turned over to Detective Johnson, who did not question Hernandez regarding the murders on the return trip to the United States.

Defendant was eventually arrested in North Las Vegas, Nevada, in February 1984. Shortly after his arrest, he signed a waiver of extradition and was returned to California. Both defendant and Hernandez were charged with murder (§ 187) and conspiracy to commit prostitution (§ 647, subd. (b)).

3. *Other Testimony*

Dana Lee testified for the prosecution under a grant of immunity while he was incarcerated on a parole violation arising out of his conviction for

burglary and possession of heroin. Lee had met defendant a month before the murders. He stated that several days before the murders, defendant asked him if he knew any women who would pose nude for photographs. Defendant told Lee that he would pay him $50 to $100 for an introduction. After initially refusing defendant's offer, Lee introduced Kreuger to defendant. According to Lee, Kreuger then introduced defendant to her roommate Jones. Both women said they would pose for defendant. Defendant then asked Hernandez to accompany him to the desert where the photo session was to take place. Hernandez agreed to go with defendant to "meet some girls." Lee recalled that later the same day, defendant and Hernandez met Kreuger and Jones in a 7-Eleven parking lot in Garden Grove and drove them to a restaurant for pizza.

Terry Allmon, the victims' roommate, recalled that after the victims returned from initially meeting with defendant and Hernandez, they told Allmon that they planned on "making a quick $500 by posing for nude photographs." According to Allmon, Jones stated that if she and Kreuger were not back by noon the next day, "something was wrong." Allmon called Jones's mother after she became worried when Jones did not return home the next day.

George "Dave" Stevens, who had been staying in the victims' apartment since approximately one month before their disappearance, testified that he saw the victims leave their apartment at approximately 1:30 a.m. on the day of the murders.

Leoncio Mondragon Garcia testified that he had worked in defendant's shop for "a few days" before the murders. Garcia recalled that the night before the murders, defendant left his shop in the early evening hours, but returned (at approximately 1 a.m.) and woke Hernandez, who was sleeping in defendant's boat in the backyard. Garcia and another employee saw defendant and Hernandez leave through the front door of the business and enter defendant's car. Garcia followed defendant and Hernandez until they stopped at a nearby gas station. Garcia returned to the shop the next morning, and stayed there until 3:30 p.m. He testified that neither defendant nor Hernandez returned to the shop while he was there.

B. *Defense*

Defendant presented an alibi defense. Henry Akers, who had known defendant for about 10 years, owned a furniture refinishing shop near defendant's establishment. Akers testified that on the morning of the murders, he spoke to defendant between 5 and 6:30, the same time Hernandez

testified that he and defendant were driving to the desert with the murder victims.

Donald Hemmer, Kreuger's boyfriend, testified that Kreuger told him the day before the murders that she was going to visit friends. According to Hemmer, after the victims disappeared, he confronted Lee about a man named Douglas or "Doug." Hemmer stated that Lee then described "Doug" as having "dark hair, a beard, about late thirties, early forties."

Finally, Karen Bobie, an acquaintance of Kreuger, stated she thought she saw both victims at the Garden Grove Mall in September, one month after the murders were committed. Although she had never met Jones, Bobie testified she became familiar with her picture from a missing persons flyer. All three witnesses were extensively cross-examined by the prosecution.

## C. *Penalty Phase Evidence*

The People introduced evidence under section 190.3, factor (b), of three incidents of prior criminal activity. A different woman testified as to each incident. As explained in greater detail below, witnesses McGettrick and Pendleton testified about separate incidents in 1976, when defendant forced or frightened them into posing for nude photographs or performing sex acts with him in the desert. The third woman, Williams, testified that in 1977 defendant sought her participation in a plan to make movies involving the torture and killing of girls or women. Defendant was charged with attempted murder and other crimes arising out of this plan and, after the jury deadlocked, he eventually pleaded nolo contendere to solicitation to commit a felony under section 653f. Defendant presented testimony by various relatives and acquaintances regarding his good character, his nonviolent nature and his background as an orphan and an abused child. In rebuttal, the People introduced evidence that defendant's wife of 33 years (who had testified on his behalf) had lost contact with defendant before the murders were committed, and had not seen him again until he was in custody.

## II. GUILT PHASE ISSUES

### A. *Lack of Territorial Jurisdiction*

At the preliminary hearing and again in superior court, defendant moved to dismiss on the ground that Orange County lacked jurisdiction. As stated above, defendant and Hernandez were initially charged with conspiracy to commit murder (§ 182), murder (§ 187) and conspiracy to commit prostitution (§ 647, subd. (b)). The prostitution conspiracy charge was based on evidence that the two men had planned to engage in sex with Kreuger and

Jones for money. When Hernandez was granted immunity in exchange for his testimony, the conspiracy charges against both Hernandez and defendant were dismissed. ■ Defendant contends that once the conspiracy charges were dropped, the Orange County Municipal and Superior Courts lacked territorial jurisdiction over his case because there was no evidence to connect the murders of Kreuger and Jones to Orange County aside from "inconsequential preliminary arrangements" made between defendant and Hernandez prior to the killings. Such minor preliminary arrangements, defendant argues, are insufficient to confer jurisdiction on Orange County. (See *People* v. *Powell* (1967) 67 Cal.2d 32 [59 Cal.Rptr. 817, 429 P.2d 137].) Instead, defendant asserts, after the conspiracy charges were dismissed only San Diego County—where the crimes were committed—had jurisdiction. Defendant observes that, although preliminary arrangements need not rise to the level of an element of the offense, nonetheless, under section 781, such arrangements must be "requisite to the consummation of the offense" in order for jurisdiction to lie.

In ruling on defendant's motion, the municipal court concluded, "there is territorial jurisdiction in the County of Orange to try this matter, relying on the theory that preliminary arrangements, which led to the commission of the offense, were held in Orange County; that principle being upheld in *People* v. *Tabucchi* [(1976)] 64 Cal.App.3d 133 [134 Cal.Rptr. 245], which, in turn, relies on section 781 of the Penal Code." The superior court similarly rejected defendant's argument that it lacked jurisdiction over his case, notwithstanding the dismissal of the conspiracy charges.

As both lower courts noted, section 781 resolves the jurisdictional question. That section states: "When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory." In *Powell, supra,* 67 Cal.2d 32, a kidnapping of two police officers began in one county, and one of the officers was killed in another. We held that under section 781, the county in which the preliminary arrangements for the crime were made was a proper county to prosecute the offense even though the preparatory acts did not constitute an essential element of the crime. (67 Cal.2d at p. 62; see *People* v. *Abbott* (1956) 47 Cal.2d 362, 370 [303 P.2d 730].)

Defendant seeks to distinguish *Powell* on the ground that he did not engage in planning in Orange County to murder or to kidnap the victims; rather, he claims, the women accompanied him voluntarily to San Diego County. As the People observe, however, several preliminary acts leading to the consummation of the crimes occurred in Orange County. For example,

defendant met his victims in Orange County; arrangements for the desert photography session were made there; and on the morning of the murders, defendant, Hernandez and the victims met in that county before leaving for the desert in San Diego County. We find the totality of the acts sufficient to confer jurisdiction on Orange County. (*Powell, supra*, 67 Cal.2d at p. 62.)

Moreover, we disagree with defendant that once the conspiracy charge was dismissed, Orange County lost jurisdiction to try the case. In *Powell, supra*, we rejected the defendant's attempt to distinguish *Abbott, supra*, 47 Cal.2d 362, on the ground that in *Abbott* the defendant was charged with both murder and kidnapping, whereas in *Powell* there was no kidnapping charge. In so doing, we stated: "We are satisfied that territorial jurisdiction in criminal cases should depend upon the acts committed rather than upon the form of the accusatory pleading. . . . The section was intended to broaden criminal jurisdiction beyond the rigid limits fixed by the common law in cases of crimes committed in more than one jurisdiction. . . . Since section 790 is not exclusive in cases of murder, section 781 may properly be applied here. It follows that although the kidnapping of [the officers] in Los Angeles may not have constituted an essential element of the murder offense, there took place in Los Angeles County sufficient acts preliminary to the murder to allow jurisdiction to attach in that county under section 781." (67 Cal.2d at pp. 62-63.)

Like the *Powell* court, we find the preliminary arrangements made by defendant in Orange County were sufficient to confer territorial jurisdiction on the Orange County courts. The first necessary steps toward execution of the ultimate crimes occurred in Orange County. Accordingly, we find no error in the court's rulings allowing the prosecution of the charged crimes in Orange County.

## B. *Improper Venue*

 Defendant contends the trial court erred in denying his pretrial motion for a change of venue on the ground that he could not receive a fair trial in Orange County because of the combined effect on the jury of publicity surrounding the present trial and his 1977 arrest and subsequent trial for attempted murder. Defendant argues that although he was successful in excluding (pursuant to a pretrial motion *in limine*) the prior arrest and trial from the guilt phase of the present trial, his tactical decision to do so under Evidence Code sections 352 and 1101, subdivision (b), made it impossible for him to conduct voir dire on the effect of the 1977 pretrial publicity without exposing the jurors to exactly the prejudicial publicity that created the potential for bias.

█ A change of venue motion must be granted if a defendant can show that absent such relief, there is a reasonable likelihood he will not receive a fair and impartial trial. (*People* v. *Williams* (1989) 48 Cal.3d 1112, 1125 [259 Cal.Rptr. 473, 774 P.2d 146]; *People* v. *Harris* (1981) 28 Cal.3d 935, 948 [171 Cal.Rptr. 679, 623 P.2d 240].) Whether raised on petition for writ of mandate or on appeal from a judgment of conviction, "the reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable." (*Williams, supra*, 48 Cal.3d at p. 1125; *People* v. *Adcox* (1988) 47 Cal.3d 207, 231 [253 Cal.Rptr. 55, 763 P.2d 906].) The factors to be considered on review are the nature and gravity of the offense, the nature and extent of the media coverage, the size of the community, the community status of the defendant and the prominence of the victim. (*Williams, supra*, 48 Cal.3d at p. 1125; *People* v. *Salas* (1972) 7 Cal.3d 812, 818 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832].)

As we observed in *Williams,* however, review on appeal differs from writ review in that after trial the review is retrospective. (48 Cal.3d at p. 1125.) In other words, "any presumption in favor of a venue change is unnecessary, for the matter may then be analyzed in light of the voir dire of the actual, available jury pool and the actual jury panel selected." (*Id*. at pp. 1125-1126.) The question then is whether, in light of the failure to change venue, it is reasonably likely a fair trial was not had. (*Adcox, supra,* 47 Cal.3d at p. 231.)

█ Our review of the record reveals the trial court's denial of the venue motion was proper. The record shows the court determined that the status of the defendant and the victims' prominence in the community were neutral factors. Although the murder victims were popular with their friends and families, there is no indication that they were "prominent" in Orange County. (See *Harris, supra,* 28 Cal.3d at p. 949.) Next, although the court observed that the nature and gravity of the offense was a "major factor" in determining proper venue (at one point the court stated, "this is not the regular run of the mill type of homicide that we are dealing with, nor was the Hillside Strangler, nor the Manson case, nor the attempt to shoot President Reagan"), the court also believed that in a community the size of Orange County, defendant could receive a fair trial. In this context, it noted that Orange County's population was approximately 2 million, making it one of the 10 largest counties in the United States. (Compare *Williams, supra*, 48 Cal.3d at p. 1126 [reversed on venue grounds when sensational murder trial held in "relatively small county"; the defendant was Black and the victim was White and from a prominent family].)

As to the publicity received, the court observed that there were 43 "highly inflammatory" newspaper articles written about defendant's 1977 arrest,

whereas there were only 9 articles regarding the 1982 murders. When defense counsel argued that he was concerned with the combined effect of the articles on the present jury, the court stated that in light of the passage of time between the first and second trials, the county was large enough that jurors could be found who could set aside their own prejudices and decide the case on the evidence presented.

Initially, in conducting voir dire, the court spoke to the panelists in groups of 12 and asked general questions about whether anyone had heard of defendant or whether his name "rang a bell" with any of the prospective jurors. No juror recalled having heard of defendant or his prior trial. Later, during individual examination, one juror was excused for cause after she revealed to the court that she overheard people discussing the case at a dinner party she had attended.

In addition, defendant presents no evidence indicating the jurors remembered at all, let alone improperly relied on, evidence of the 1977 trial.[2] Moreover, the record reveals that none of the jurors selected remembered anything damaging to defendant, none knew about his prior criminal background, and none had formed an opinion concerning his guilt or innocence.

---

[2] After defense counsel exercised a peremptory challenge to excuse Juror Camarillo, the prosecutor requested an in chambers discussion with defendant present. The following colloquy occurred:

"Mr. Rackacaus [Prosecutor]: I just wanted to raise this idea for the record because I think it's possibly—it's something I've been thinking about. I think it's dramatized with the—Miss Camarillo raising the idea that she—once she figured out that this was a case that she had heard of and she knew about, she became—she developed a frame of mind she felt that she couldn't sit on the case, she would be prejudiced. [¶] I've thought about this a little bit before, and I assume that for strategical purposes the defense did not want to discuss with the jury any of the old articles that might have appeared in the newspapers, probably didn't want to raise the possibility or the fact of the jurors finding out that the defendant has been tried back in the past, and I,—that's back in 1978, so I assume that's a strategical decision that the defense made. [¶] But my concern is that when we have—we may have some jurors sitting that when they put it together, they're going to remember that there was back in '78 publicity about a snuff murder case, and that, you know—snuff murder, Fred Douglas, and pretty soon develop a similar frame of mind as Miss Camarillo did.

"Mr. Peters [Defense Counsel]: I have given this considerable thought, and Mr. Rackacaus is right. . . . [¶] I mean, we brought an [Evidence Code section] 1101[, subdivision] (b) motion, and we were successful on it, so obviously I have avoided. . . . I want to try the case on the facts that the prosecutor has in this case and not have to relitigate the 1978 case. [¶] I consciously avoided mentioning the question, 'Have you heard anything about a snuff murder' conscientiously because it could— people might relate back to something that happened years ago which they made the connection Mr. Douglas had some prior problem. [¶] Seems to me the only thing we can do is we can—is we're going to have two or three, maybe ought to select more than two or three alternates, maybe four, and some juror at some point in the trial says, 'Oh, my God, I remember something about this,' then deal with it on a—because it's a prospective problem."

The court agreed with counsel that it would be best to approach any "prospective problem" with a juror on a "one-to-one basis."

Accordingly, we find that under the facts, it is not reasonably likely defendant was denied a fair trial. (*Williams, supra,* 48 Cal.3d at p. 1132; see *People v. Balderas* (1985) 41 Cal.3d 144, 177 [222 Cal.Rptr. 184, 711 P.2d 480].)

## C. *Admissibility of Hernandez's Testimony*

### 1. *Facts*

In March 1984, Hernandez was arrested by Mexican police in Loreto, Mexico. Detective Johnson of the Anaheim Police Department was informed of the arrest shortly thereafter, and he and other United States police officers traveled to Mexico to return Hernandez to the United States. On arrival in Mexico, the United States officers informed the local police of the murders of Kreuger and Jones, showed them the affidavit for the arrest warrant, and provided them with some photographs. The Mexican officers informed the United States officers that they intended to question Hernandez,[3] and asked to borrow a tape recorder, which the Americans provided. The United States authorities were then advised that they would be contacted when the questioning was concluded.

Mexican officials proceeded to question Hernandez. When they were unsuccessful in their initial inquiries, Hernandez claims they resorted to physical violence, subjecting him to a 15-20 minute beating.[4] Hernandez still did not talk. The Mexican police ceased the interrogation, but informed Hernandez that he could expect even worse treatment that evening. As promised, the officers returned later that evening. Hernandez had earlier noticed that one of them had carried an automatic weapon. The officers informed Hernandez that they were going to "take him out to the beach." At this point, fearing for his life, Hernandez gave a full confession. His statement was typed and signed after he was told it would not be given to United States officials, but instead would simply be placed in the Mexican police files.

Mexican police thereafter released Hernandez to United States authorities, and gave them a copy of Hernandez's statement. The United States officers escorted Hernandez across the border, where he was officially arrested, then taken to court in Anaheim for arraignment. Before he was arraigned, Hernandez was interviewed at the police station by Detective Johnson and Deputy District Attorney Rackacaus. Rackacaus did not give Hernandez the warnings required by *Miranda* v. *Arizona* (1966) 384 U.S.

---

[3] The American officers did not request that Mexican officials interrogate Hernandez, nor, apparently, were they invited to attend the Mexican interrogation.

[4] Hernandez testified that he was hit in the face, stomach and sides, that his hair was pulled and that a rib was fractured.

436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; rather, he informed Hernandez that their discussion was to be "off the record" and that it could not be used against him at trial. Before informing him of the charges he faced and the possible penalties therefor, Rackacaus told Hernandez that he was in "serious trouble." Rackacaus stated he wanted to know Hernandez's story to see if he could be used as a witness against defendant. Hernandez agreed to tell his story. Rackacaus then asked Hernandez if he wanted the interview taped, and Hernandez stated he did not.

During the interview, Rackacaus never mentioned the alleged Mexican confession, nor did he inform Hernandez that United States authorities had any knowledge of it. Although Hernandez suspected that the American police may have been given the Mexican statement, he did not know if his suspicions were borne out.

Rackacaus made no offer of leniency before the interview, but indicated afterward that if Hernandez cooperated, the charges against him might be reduced. During the interview, counsel for Hernandez arrived at the police station. Rackacaus told Hernandez of this fact, and Hernandez indicated he would finish giving his statement before speaking with counsel. Hernandez's statement conformed closely to the one he had given to the Mexican officials. He subsequently testified that his statements to Rackacaus were made freely and voluntarily.

A few weeks after the interview, following negotiations between the prosecution and Hernandez's counsel, Hernandez was granted immunity in exchange for his testimony against defendant.[5] Defendant sought extraordinary writ relief in the Court of Appeal in an effort to vacate the order granting immunity. The court summarily denied relief and we rejected defendant's petition for review. The trial court next held a hearing pursuant to Evidence Code section 402 on the voluntariness of Hernandez's statment to Rackacaus, and concluded "beyond a reasonable doubt and to a moral certainty that the statements by Hernandez were indeed voluntary here in the U.S." The court subsequently stated for the record that it had excluded the Mexican confession as involuntary.

## 2. *Defendant's Contentions*

Defendant asserts Hernandez's trial testimony "was inadmissible as a matter of law because it was obtained by improper and coercive police and prosecution conduct," and that the trial court therefore erred in permitting

---

[5]No conditions were placed on the grant, and he was not required to testify in conformity with his earlier representations. He was, however, informed that he could be prosecuted for perjury if he testified untruthfully.

its admission into evidence. He argues that (i) the coercive tactics employed by the Mexican police in extracting Hernandez's initial confession are attributable to United States authorities, (ii) the "taint" from the initial coerced confession was never "purged" (and was in fact aggravated by subsequent police and prosecutorial misconduct), and (iii) the testimony under grant of immunity was itself a form of "coercion" sufficient on these facts to mandate exclusion of the trial statements. As we explain below, we reject each contention.

### 3. *Law Governing Review*

As a preliminary matter, we address what law governs this issue. The murders of Kreuger and Jones occurred in August 1982. Before the offenses were committed, however, the voters of this state adopted the initiative measure designated on the ballot as Proposition 8. Section 3 of the initiative added section 28, subdivision (d), to article I of our state Constitution. That section, labeled the "Right to Truth-in-Evidence" provision, declares that "relevant evidence shall not be excluded in any criminal proceeding." In *People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149], we held that Proposition 8 applied to offenses committed on or after its effective date of June 9, 1982.

Recently, in *People* v. *Markham* (1989) 49 Cal.3d 63, 65, 71 [260 Cal.Rptr. 273, 775 P.2d 1042], we determined that the "Truth-in-Evidence" provision of Proposition 8 abrogated the rule adopted in *People* v. *Jiminez* (1978) 21 Cal.3d 595, 605 [147 Cal.Rptr. 172, 580 P.2d 672], imposing a stricter standard of proof on the voluntariness of confessions than that used by the federal courts. Thus, we determined that the voluntariness of confessions or admissions must be shown by a preponderance of the evidence. (*Markham, supra,* 49 Cal.3d at p. 71.) With this standard in mind, we review defendant's substantive arguments.

### 4. *Burden of Proving Involuntariness*

Defendant correctly observes that the federal and California courts have consistently recognized that the "admission at trial of improperly obtained statements which results in a fundamentally unfair trial violates a defendant's Fifth Amendment right to a fair trial." (*Wilcox* v. *Ford* (11th Cir. 1987) 813 F.2d 1140, 1148; see also *United States* v. *Chiavola* (7th Cir. 1984) 744 F.2d 1271, 1273-1274; *United States* ex rel. *Cunningham* v. *DeRobertis* (7th Cir. 1983) 719 F.2d 892, 895-896; *United States* v. *Fredericks* (5th Cir. 1978) 586 F.2d 470, 480; *LaFrance* v. *Bohlinger* (1st Cir. 1974) 499 F.2d 29, 34-35; *People* v. *Leach* (1985) 41 Cal.3d 92, 102-104 [221 Cal.Rptr. 826, 710 P.2d 893]; *People* v. *Varnum* (1967) 66 Cal.2d 808 [59 Cal.Rptr

108, 427 P.2d 772].) ■ But unlike those situations in which a defendant challenges his *own* prior involuntary statements (see *Lego* v. *Twomey* (1972) 404 U.S. 477, 489 [30 L.Ed.2d 618, 627, 92 S.Ct. 619] [the government must prove voluntariness of defendant's confession by preponderance of evidence]; *Markham, supra*, 49 Cal.3d 63, 71 [same]), when a defendant seeks to exclude the allegedly involuntary testimony of a witness or codefendant, the *defendant* bears the burden of proving that the admitted statements were involuntarily obtained (*Leach, supra*, 41 Cal.3d at pp. 102-104).

As we observed in *Leach*, the heightened protections courts have traditionally afforded defendants in the self-incrimination context are designed to assure that an accused's coerced confessions will not be used against him, and to protect against evidence of guilt emanating from his own involuntary statements. (41 Cal.3d at p. 103.) "[T]here is no such need for prophylactic rules directed at assuaging our fear of convicting the innocent—or even the guilty—by means of evidence obtained in violation of due process, when the victim of the violation is not the defendant. In such a case, we see no reason for departing from the ordinary rule that a party 'claiming that a person is guilty of . . . wrongdoing has the burden of proof on that issue.' (Evid. Code, § 520)." (*Id.* at p. 104.)

■ Defendant fails to meet his burden here. Although he emphasizes the assertedly coerced Mexican confession and the subsequent informal interview between Hernandez and Rackacaus, this emphasis misperceives the limited nature of the exclusion recognized for coerced third party testimony. (*Leach, supra*, 41 Cal.3d at p. 104.) Because the exclusion is based on the idea that coerced testimony is inherently unreliable, and that its admission therefore violates a defendant's right to a fair trial, this exclusion necessarily focuses only on whether the evidence *actually admitted* was coerced. Here, none of the statements made by Hernandez to the Mexican police was introduced at defendant's trial. Accordingly, defendant can prevail on his suppression claim only if he can show that the trial testimony given by Hernandez was involuntary at the time it was given. (*Ibid.*)

5. *Fifth Amendment Claim*

We reiterate that even though the issue before us involves an alleged forced confession, it does not involve a violation of *defendant's* right against self-incrimination under the Fifth Amendment. Neither the People's discovery of Hernandez as a potential witness, nor Hernandez's trial testimony was gained from incriminatory statements made by defendant. (Cf. *United States* v. *Ceccolini* (1978) 435 U.S. 268 [55 L.Ed.2d 268, 98 S.Ct. 1054] [violation of defendant's Fourth Amendment rights may justify exclusion of live witness testimony discovered as a result]; accord *People* v. *Superior*

*Court (Sosa)* (1982) 31 Cal.3d 883, 892-894 [185 Cal.Rptr. 113, 649 P.2d 696].) Moreover, defendant lacks standing to object to any perceived violation of *Hernandez's* privilege against self-incrimination. That right is personal, and may not be vicariously asserted by another. (See, e.g., *Wilcox v. Ford, supra*, 813 F.2d at p. 1148, fn. 13; *United States v. Fredericks, supra*, 586 F.2d at p. 480; *United States v. Shaffner* (7th Cir. 1975) 524 F.2d 1021, 1022; see also *Alderman v. United States* (1969) 394 U.S. 165 [22 L.Ed.2d 176, 89 S.Ct. 961].) Any basis for excluding Hernandez's testimony must be found in a federal constitutional right personal to defendant. (*Markham, supra*, 49 Cal.3d at p. 71.)

### 6. *Discussion*

In *Bradford v. Johnson* (E.D.Mich. 1972) 354 F.Supp. 1331, one of the first cases to consider the exclusion of coerced testimony by a nondefendant, police officers arrested suspect Payne and subjected him to a prolonged period of beatings and torture, ceasing only after Payne implicated the defendant and agreed to testify against him at trial (apparently in exchange for the cessation of torture). In holding Payne's trial testimony was so untrustworthy as to violate the defendant's right to a fair trial, the court noted that Payne "was physically tortured before arraignment. He appeared at arraignment visibly beaten and was returned by the magistrate to the custody of his torturers. He was tortured until he confessed *and* incriminated petitioner. He was promised cessation of his torture only after he incriminated another in addition to himself. . . . The [trial] testimony of a witness obtained by these means when he must surrender himself immediately after testifying to those persons who tortured him, does not comport with due process." (*Id.* at p. 1336.)

The *Bradford* court was careful to note, however, that "[t]his does not mean that incriminations of others coerced by torture necessarily poison all future [trial] testimony." (354 F.Supp. at p. 1337; see also *United States v. Ceccolini, supra*, 435 U.S. at p. 278 [55 L.Ed.2d at p. 278] ["we have specifically refused to hold that 'making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.' "].) Indeed, in the numerous cases following *Bradford,* few, if any, have ordered suppression of *trial testimony* that was not itself shown to be unreliable or coerced. (See also *United States v. Merkt* (5th Cir. 1985) 764 F.2d 266, 274 [recognizing distinction between suppressing reliable trial testimony *following* an earlier coerced statement, and suppressing only the coerced out-of-court statement itself]; *DeRobertis, supra*, 719 F.2d at p. 896 ["in contrast to . . . *LaFrance* and *Bradford,* the allegedly coerced confession [in this case] *was not introduced at petitioner's trial.* While the confession may have aided in the

investigation of the crime, this use presents no basis for relief . . . *if there was nothing improper about the trial itself* [italics added]"]; *United States* v. *Shaffner, supra*, 524 F.2d at p. 1022 [trial court not required to rule on whether codefendant's possibly coerced confession was voluntary because codefendant pleaded guilty, testified on behalf of the government, and stated the confession was voluntary]; cf. *LaFrance, supra,* 499 F.2d 29 [prohibiting use of coerced *out-of-court statements* for impeachment purposes when codefendant testified at trial *recanting* the coerced statements].)

 In the present case, defendant fails to demonstrate that Hernandez's trial testimony was coerced. Hernandez was not subjected to any violence by United States authorities, and thus, unlike the defendant in *Bradford,* was not forced to "surrender himself immediately after testifying to those persons who tortured him." (*Bradford, supra,* 354 F.Supp. at p. 1336.)[6] By contrast, Hernandez testified under a general grant of immunity, precluding use against him of any statements made in connection with his testimony. The immunity agreement was reached only after Hernandez consulted with counsel and after negotiations between counsel and the prosecution. █ ██ ██ ██ ██ The agreement required only that Hernandez testify truthfully as to his knowledge of the murders, and was not conditioned on consistency of his testimony with his earlier out-of-court statements, or on ultimate conviction of the defendant. (Cf. *U.S.* ex rel. *Blackwell* v. *Franzen* (N.D.Ill. 1981) 540 F.Supp. 151, 154 [coercion involving out-of-court confession by codefendant would taint codefendant's trial testimony when codefendant plea bargained to testify "consistently with [his] challenged confession"].)[7] Moreover, Hernandez testified under oath that his statements were made freely and voluntarily and were not compelled by the earlier statements that he made in Mexico. His trial testimony was subject to thorough cross-examination and impeachment.

---

[6]Defendant argues, somewhat obliquely, that Hernandez's testimony may have been coerced because while he was in custody prior to defendant's trial, he was charged with conspiracy to smuggle heroin into jail and with possession of marijuana and drug paraphernalia. Although these charges were not resolved until after defendant's trial, defendant fails to allege any express or implied threats or promises of leniency made in connection with these charges. Accordingly, we discern no causal link between these collateral charges and Hernandez's testimony in the present case.

[7]Defendant seems to suggest that testimony rendered pursuant to a grant of immunity is itself "coerced" or involuntary because failure to testify renders the witness subject to punishment by contempt. The contention is without merit. We have held that a defendant is not denied the right to a fair trial by virtue of admission of the immunized testimony of a codefendant, so long as the grant of immunity to the codefendant is made only on condition that *he testify fully and fairly as to his knowledge of the facts out of which the charge arose. (People* v. *Allen* (1986) 42 Cal.3d 1222, 1252 [232 Cal.Rptr. 849, 729 P.2d 115].) Because defendant is unable to demonstrate that there were any impermissible conditions on the immunity granted Hernandez, we cannot conclude that the existence of the immunity agreement itself rendered Hernandez's testimony improper and violated defendant's fundamental right to a fair trial.

In a similar case, *Wilcox* v. *Ford, supra*, 813 F.2d 1140, the defendant was accused of murdering a victim whose body was not discovered until eight years after the crime was committed. The primary prosecution witness was Wrentz, an elderly, illiterate man, who had been in the company's employ for over 30 years. He testified, apparently under a grant of immunity, that he helped defendant and several other men load the victim's corpse into a box, after which they drove to a secluded spot where they buried the body.

Defendant sought to exclude Wrentz's testimony on the ground that Wrentz's earlier consistent statement to police had been impermissibly coerced from him. The Eleventh Circuit Court of Appeals rejected the claim, noting: "Even assuming that the police employed improper interrogation techniques to obtain . . . Wrentz's out-of-court statements implicating Wilcox in the crime, [they were not] introduced at trial. . . . There is no proof that Wrentz was incompetent to testify or that his trial testimony was coerced. . . . [¶] Even assuming, however, that the reliability of Wrentz's direct testimony . . . was somewhat suspect, the defendant had adequate tools in hand to challenge the reliability before the jury. The defense had full knowledge of the nature of Wrentz's . . . interrogation, had access to the tapes and transcripts of the interrogation sessions prior to trial, and had a full opportunity to use those materials in examining [him]. Furthermore, in addition to a full opportunity to cross-examine [the witness], Wilcox had adequate opportunity to put on independent evidence to discredit the challenged testimony and did in fact put on such evidence. Finally, the trial court gave the appropriate jury charges on reasonable doubt, credibility, and immunity to aid them in assessing the value of the evidence in question. Considering all of these factors, we conclude that Wilcox did receive a fundamentally fair trial in spite of any government misconduct that might have occurred." (*Wilcox* v. *Ford, supra*, 813 F.2d at p. 1149.)

Similarly, in the present case, defendant does not claim that Hernandez's allegedly coerced out-of-court statements were improperly admitted at trial. Rather, he challenges only Hernandez's trial testimony. Here, as in *Wilcox,* the accomplice's trial testimony was subject to cross-examination and impeachment, and defendant possessed "adequate tools" with which to challenge the reliability of Hernandez's testimony, being fully apprised of all of the circumstances surrounding Hernandez's earlier interrogation in Mexico. Moreover, we are unpersuaded that Hernandez was in any way subject to coercion at the time he testified at defendant's trial. Accordingly, under the circumstances of this case, we cannot say that the admission of Hernandez's trial testimony deprived defendant of a fair trial.

Defendant maintains, nonetheless, that Hernandez's trial testimony and his out-of-court statements are inseparable for admissibility purposes, and

that we must examine the "totality of circumstances" to determine voluntariness here. Analogizing to the "successive confession" cases in the Fifth Amendment context (e.g., *Clewis* v. *Texas* (1967) 386 U.S. 707 [18 L.Ed.2d 423, 87 S.Ct. 1338]; *Lyons* v. *Oklahoma* (1944) 322 U.S. 596 [88 L.Ed. 1481, 64 S.Ct. 1208]; see also *People* v. *Hogan* (1982) 31 Cal.3d 815 [183 Cal.Rptr. 817, 647 P.2d 93]), defendant argues that the "physical abuse and prior coerced confessions establish an unbroken chain of coercion culminating in Hernandez's testimony at the trial." Defendant contends that none of the events subsequent to the Mexican confession was sufficient to "purge the taint" of the earlier involuntary statements.

Even assuming arguendo that such "poisonous fruit" analyses are applicable to cases in which a defendant challenges a *third party*'s allegedly coerced statement,[8] we believe defendant's claim must fail on these facts.

The federal[9] constitutional standard concerning successive confessions was enunciated by the Supreme Court in *Lyons* v. *Oklahoma, supra,* 322 U.S. 596. As here, the *Lyons* court was faced with a situation in which assertedly "improper methods were used to obtain a confession, but that confession was not used at the trial. Later, in another place and with different persons present, the accused again told the facts of the crime." (*Id.* at p. 602 [88 L.Ed.2d at p. 1485].) ▮ *Lyons* observed that "[t]he voluntary or involuntary character of a confession is determined by a conclusion as to whether the accused, at the time he confesses, is in possession of 'mental freedom' to confess to or deny a suspected participation in a crime. . . . [¶] . . . *If the relation between the earlier and later confession is not so close that one must say the facts of one control the character of the other, the inference is for the triers of fact and their conclusion, in such an uncertain situation, that the confession should be admitted as voluntary, cannot be a denial of due process."* (*Id.* at pp. 602-603 [88 L.Ed.2d at pp. 1485-1486].)

▮ Here, we are unpersuaded that the asserted facts surrounding Hernandez's confession in Mexico, as offensive as they may be to our notions of civilized conduct, necessarily "control the character of" the testimony given by Hernandez at trial. First, we disagree with defendant's assertions that the coercion applied by the Mexican authorities can somehow be attributed to the United States police, or that United States authorities were "joint

---

[8] For purposes of analysis in *Leach, supra,* 41 Cal.3d 92, 102, footnote 8, we "assume[d]" this "doubtful issue[ ] of . . . law" in defendant's favor. We expressly declined to decide the issue at that time, however.

[9] As noted, in considering the remedial exclusion of otherwise relevant evidence in this context, we are guided by federal constitutional principles. (See *Markham, supra,* 49 Cal.3d 63, 68-71.)

venturers" in the Mexican interrogation. On the contrary, there is no evidence that the Mexican authorities were acting at the behest of United States officials, or that the United States authorities even had knowledge of the alleged beatings at the time they occurred. The fact that United States officials knew the Mexican police would question Hernandez, or that they shared information about the crime with Mexican authorities or lent them a tape recorder upon request, hardly indicates knowledge or approval by United States officials of the assertedly improper interrogation tactics utilized by the Mexican police.

Moreover, we believe any "taint" remaining from Hernandez's Mexican confession was dissipated following Hernandez's escort across the border by United States officials. By Hernandez's own account, any remaining threat of beatings disappeared once he crossed the border, and he was confident that physical coercion could not and would not be used against him here.[10] He was at this point completely outside the reach of his earlier tormentors and had no reason to anticipate further mistreatment. (See *Leon* v. *Wainwright* (11th Cir. 1984) 734 F.2d 770, 772-773 [subsequent confession found voluntary under *Lyons* v. *Oklahoma, supra*, 322 U.S. 596, when police obtained earlier statements by physical force and threats, but subsequent statements were obtained by "a completely different group of police officers" who "meticulously explained" defendant's constitutional rights before taking statement].)

In addition, we note that Rackacaus, in his subsequent interview with Hernandez, scrupulously avoided any mention of the Mexican confession and, although Hernandez suspected possible United States awareness of his Mexican confession, he was never informed of or threatened with that fact. Nor was Hernandez offered leniency in return for his statements, although he was told of the potentially grave charges he faced and their possible penalties. Finally, although Rackacaus apparently did not read Hernandez his *Miranda* rights, and his arraignment was briefly delayed, he was told in the informal interview that his statements could not be used against him. Thus, we are not persuaded that Hernandez's statements to Rackacaus were unlawfully coerced, or that they were a direct product of the coerced Mexican confession.

Accordingly, we conclude that subsequent events in the United States sufficiently purged any "taint" remaining after the Mexican confession. Even assuming that a "successive confession" analysis under *Lyons* v. *Oklahoma, supra*, 322 U.S. 596, is appropriate here, we are satisfied that Hernan-

---

[10] Hernandez testified that after he returned to the United States, he "knew [he] wasn't going to get beat up or forced to say anything [he] didn't want to."

dez's trial testimony was sufficiently unrelated to his Mexican confession so as to dissipate any possible "taint" from the earlier statements. In sum, we conclude that defendant was not denied his constitutional right to a fair trial by virtue of the admission of Hernandez's trial testimony.

■ In so concluding, we must also reject defendant's claim that Rackacaus's alleged "prosecutorial misconduct" in obtaining Hernandez's initial statements merits reversal. If admission of Hernandez's testimony did not deprive defendant of a fair trial, a fortiori, pretrial prosecutorial efforts to secure that testimony did not impair defendant's right to a fair trial.

■ Finally, we reject defendant's claim that his conviction must be reversed because Hernandez's preliminary hearing testimony, made at a time when Hernandez was still a codefendant, was involuntary, and therefore should not have been relied on by the court in binding defendant over for trial. "Illegalities in pretrial commitment proceedings, other than those which are 'jurisdictional in the fundamental sense,' are not reversible per se on an appeal from the subsequent trial. Rather, 'defendant [must] show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination.' (*People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].)" (*People* v. *Alcala* (1984) 36 Cal.3d 604, 628 [205 Cal.Rptr. 775, 685 P.2d 1126].) Because we conclude that defendant's trial was fair, his pretrial "sufficiency of the evidence" claim must fail. (See *People* v. *Moore* (1986) 185 Cal.App.3d 1005, 1017-1018 [230 Cal.Rptr. 237]; *People* v. *Flint* (1986) 180 Cal.App.3d 13, 17-18 [225 Cal.Rptr. 323].)

### D. *Corroboration—Sufficiency of Evidence*

■ Defendant argues that, assuming Hernandez was found by the jury to be an accomplice, the People presented insufficient corroboration of Hernandez's testimony. Section 1111 provides, "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such proper evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances." ■ The key inquiry is whether the evidence *tends* to connect the defendant with the crime so that the jury may be satisfied that the accomplice is telling the truth.[11] (*People* v.

---

[11] The People also argue that Hernandez was not an accomplice, because he did not know of defendant's unlawful purpose and intent to facilitate the murders. (*People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318].) Rather, the People urge us to determine that Hernandez was an aider and abettor whose testimony did not require independent corroboration. Because the jury was instructed under CALJIC No. 3.14 (no accomplice liability if aiding or assisting without knowledge of unlawful purpose) and CALJIC No. 3.10

*Bunyard* (1988) 45 Cal.3d 1189, 1206-1207 [249 Cal.Rptr. 71, 756 P.2d 795].) Moreover, corroborating evidence is sufficient if it connects the defendant with the crime, although such evidence is slight and entitled to little consideration when standing alone. (*People* v. *Garrison* (1989) 47 Cal.3d 746, 773 [254 Cal.Rptr. 257, 765 P.2d 419].) Finally, "[c]orroborating evidence may be circumstantial in nature, and may consist of evidence of the defendant's conduct or his declarations." (*Garrison, supra*, 47 Cal.3d at p. 773.) ▌ Assuming for the purpose of this determination that Hernandez was an accomplice whose testimony required corroboration under section 1111, we are fully convinced that there was sufficient corroborating testimony at trial.

As explained above, in addition to Hernandez's testimony, statements of several other witnesses tended to connect defendant to the murders. Lee testified that two days before the victims disappeared, he introduced Kreuger to defendant after she told Lee that she was in need of money. Thereafter, Lee testified that he drove Kreuger to her home, where he met Jones. According to Lee, both girls discussed a "photo session" with defendant.

Garcia testified that on the morning the murders were committed, he saw defendant and Hernandez leave defendant's refinishing shop at 1 a.m. At the same time, the victims' roommate, Stevens, testified he saw the victims leave their apartment at 1:30 a.m.

On the afternoon before her disappearance, Jones told her best friend, Allmon, that she and Kreuger were going "to make an easy $500 by posing for nude pictures." Allmon also testified that Jones told her if she had not returned by noon the following day that "something was wrong," and she was to "do something."[12]

We conclude Hernandez's testimony was substantially corroborated. (See *Garrison, supra*, 47 Cal.3d at p. 773.)

## E. *Accomplice Instructions*

▌ The court instructed the jury on both the sufficiency of the testimony of a single witness *and* the requirement of corroboration for the testimo-

---

(defining an accomplice), we believe the determination of Hernandez's status as an accomplice properly was left to the jury's determination.

[12] In addition, defendant and Hernandez admitted leaving California for Canada shortly after they were questioned by the police regarding the disappearances of Kreuger and Jones. The duo later fled to Mexico after learning that the police had discovered the remains of the victims. Although we have held that a jury may reasonably infer that a defendant's flight demonstrates consciousness of guilt and may properly be considered as corroborative of an accomplice's testimony (*Garrison, supra*, 47 Cal.3d at p. 773), the trial court refused the People's proffered flight instruction following an objection by defense counsel to its propriety.

ny of an accomplice. Defendant contends that it erred by so instructing. It is settled that "we must look to the entire charge, rather than merely one part, to determine whether error occurred." (*People* v. *Chavez* (1985) 39 Cal.3d 823, 830 [218 Cal Rptr. 49, 705 P.2d 372].) After looking to the charge as a whole, we find no error. Contrary to defendant's claim, we do not believe the jury was led to disregard the instruction on the requirement of corroboration for the testimony of an accomplice by the instruction on the sufficiency of the testimony of a single witness. In our view, reasonable jurors would have understood the latter instruction as declaring the rule governing witnesses generally, and they would have understood the former as stating the exception applicable to witnesses who happened to be accomplices. (See generally *People* v. *Williams* (1988) 45 Cal.3d 1268, 1313 [248 Cal.Rptr. 834, 756 P.2d 221].)

### F. *Hernandez's Invocation of a Fifth Amendment Privilege*

During the course of the trial, Hernandez was charged with committing two felonies under section 4573 and Health and Safety Code section 11350 (conspiracy to smuggle heroin into jail and possession of marijuana and drug paraphernalia). The record reveals that immediately following his arrest on those charges, Hernandez lied to the police about his involvement in the foregoing illegal activity. Hernandez was never offered immunity in connection with either felony.

On cross-examination of Hernandez at trial, counsel for defendant sought to impeach Hernandez as a drug abuser and habitual liar by questioning him regarding the recent charges filed against him, and the fact that he lied to the police after he was implicated in the drug smuggling scheme.[13] Hernandez, however, asserted the Fifth Amendment, refusing to answer any questions pertaining to the drug charges. Defense counsel objected to Hernandez's silence on the ground that it violated defendant's right to confront and cross-examine a witness under the Sixth Amendment. As an alternative to permitting Hernandez to make a limited assertion of the Fifth Amendment privilege, defense counsel suggested that Hernandez's testimony either be stricken in its entirety, or that he be granted use immunity in exchange for his testimony. Defendant renews his argument on appeal, claiming that he suffered substantial prejudice because of Hernandez's refusal to respond to questions regarding the charges pending against him.

---

[13] Indeed, in chambers, counsel told the court he wanted to prove that Hernandez was "so much of a heroin [addict] and so much of an alcoholic that even when he's in jail waiting to testify, he wants to get loose. He uses heroin." We note the record indicates that prior to questioning Hernandez about the charges pending against him, counsel cross-examined him regarding his history of cheating in school, his 20 years of drug abuse, his past convictions for burglary, and the fact that he had lied to the Canadian police when questioned about his involvement in the present murders.

The court held an in camera hearing on the issue. In response to defense counsel's objection to Hernandez's silence on the drug charges, and his suggested alternatives, the prosecutor explained to the court that it was "very reluctant to give Mr. Hernandez anything short of a prison term on these new charges, and it just doesn't seem like a good balance to put us in that position just in order so that counsel can do some cross-examining on what is clearly a very collateral area here." The court agreed with the People after determining that "it is a collateral charge, that [Hernandez] has an absolute right to remain silent on anything about that charge." Nonetheless, the court stated it would allow counsel to reargue the issue if further discovery on the matter revealed the pending drug charges against Hernandez directly affected the present case (e.g., if the fact of *pending* charges formed the basis for a deal with the prosecution and hence, a motive to lie). The issue did not arise again.

We have consistently held that it is within the trial court's discretion to exclude collateral evidence offered for impeachment purposes (see, e.g., *People* v. *Redmond* (1981) 29 Cal.3d 904, 913 [176 Cal.Rptr. 780, 633 P.2d 976]), as well as to exclude evidence that is cumulative, confusing or misleading (Evid. Code, § 352). In addition, as defendant himself observes, he suffered no prejudice as a result of Hernandez's barred testimony because the court allowed him to call other witnesses (including a jailhouse informant) to testify about events leading to the drug smuggling charges against Hernandez. Thus, the jury was well aware of the charges pending against Hernandez and was allowed to draw its own inferences about the relationship between Hernandez's habitual drug use and the credibility of his testimony against defendant. (See *Davis* v. *Alaska* (1974) 415 U.S. 308, 318 [39 L.Ed.2d 347, 354-355, 94 S.Ct. 1105].) Accordingly, in our view, defendant had adequate opportunity to inform the jury of the charges pending against Hernandez, and his Sixth Amendment right to confront Hernandez was not significantly compromised by Hernandez's refusal to answer questions regarding the charges pending against him.

## G. *Admissibility of Phillips's Testimony*

Defendant asserts the court committed reversible error by allowing Kathy Phillips to testify, over his objection, that in 1979 (three years before the subject murders) she participated in a photo session at defendant's furniture refinishing shop during which defendant photographed her in the nude while she was bound and gagged. The next month, Phillips went for a ride with defendant during which he asked her if she wanted to make more money (Phillips was using heroin at the time). According to Phillips, defendant told her that "he wanted to take some more pictures of other women and take them out in the desert and make what he—what he

referred to as a snuff flick or movie . . . ." Phillips stated that defendant told her he wanted to drug the girls in connection with the photography sessions, "have sex with them and be really brutal" and that he "would just make a movie and it would be a lot of bondage and sadistic-type things . . . ." In addition, Phillips testified that she and defendant had discussed burying bodies so that they could not be discovered. Finally, Phillips told the jury defendant had mentioned to her that he would eventually sell the "snuff" movies to the Mafia in the United States and Canada.

Defendant argues that Phillips's testimony should have been excluded under Evidence Code section 1101, subdivision (a), which bars use of character evidence to prove conduct. Defendant relies primarily on *People* v. *Alcala, supra,* 36 Cal.3d 604, 630-631, and *People* v. *Tassell* (1984) 36 Cal.3d 77, 89 [201 Cal.Rptr. 567, 679 P.2d 1], to support his first argument that the evidence was too remote to bear on the crimes for which he was charged.

As the People note, however, neither Evidence Code section 1101, subdivision (a), nor the cases cited by defendant, bars the evidence. Of course, evidence that a defendant committed other offenses or "bad acts" is inadmissible if offered solely to prove his criminal disposition. (*People* v. *Wade* (1988) 44 Cal.3d 975, 990 [244 Cal.Rptr. 905, 750 P.2d 794].) On the other hand, when evidence of other criminal activity is relevant to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," prior criminal activity evidence may properly be used. (Evid. Code, § 1101, subd. (b).) In *People* v. *Thompson* (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883], we determined that "[a]s with other types of circumstantial evidence, . . . admissibility [of other-crimes evidence] depends upon three principal factors: (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence." (Italics in original; see also *Wade, supra,* 44 Cal.3d at p. 990.)

 Phillips's testimony tended to prove "logically, naturally, and by reasonable inference" the existence of a contested issue—identity—to which defendant's prior acts were relevant. The issue of identity was contested throughout the trial. Defendant consistently maintained, in contrast to Hernandez's testimony, that he was out of town on the day of the murders, and that it was Hernandez and Lee who actually committed the murders. Thus, Phillips's testimony was relevant not only to prove a disputed fact—that defendant committed the crimes in question—but also to corroborate Hernandez's testimony implicating defendant as the perpetrator of the murders. Accordingly, the relevancy of Phillips's testimony to prove the disputed

material issue was sufficiently substantial to raise an inference of identity. (*People* v. *Malone* (1988) 47 Cal.3d 1, 21 [252 Cal.Rptr. 525, 762 P.2d 1249].) Thus, the trial court properly concluded that the probative value of the evidence outweighed its prejudicial effect. (*Thompson, supra,* 27 Cal.3d at pp. 314, 321.)

Finally, we do not find the three-year time lag between the time defendant committed the acts testified to by Phillips and defendant's 1982 murders of Jones and Kreuger so significant as to render Phillips's testimony too remote or unreliable. The remoteness of evidence goes to its weight and not to its reliability. (*People* v. *Archerd* (1970) 3 Cal.3d 615, 639 [91 Cal.Rptr. 397, 477 P.2d 421]; cf. *People* v. *Thomas* (1978) 20 Cal.3d 457, 466 [143 Cal.Rptr. 215, 573 P.2d 433] [evidence of molestations occurring more than 10 years earlier deemed too remote and potentially prejudicial].) In any event, any error was not prejudicial. Considering Hernandez's account of the events surrounding the murders along with the other corroborating evidence presented, we believe it is highly unlikely that but for Phillips's testimony, defendant would not have been convicted. (See *Wade, supra,* 44 Cal.3d 975, 990.)

H. *Hitch Motion*

■■■■ Defendant claims the trial court erroneously denied his motion to dismiss or, in the alternative, for sanctions under *People* v. *Hitch* (1974) 12 Cal.3d 641, 645-646 [117 Cal.Rptr. 9, 527 P.2d 361], based on the prosecution's failure to preserve and disclose the names of two potential defense witnesses.

Shortly after Jones and Kreuger disappeared, and early in the police investigation of the case, Detective Grace, who was in charge of the missing persons investigation for the Anaheim Police Department, was notified by Mrs. Jones, the victim's mother, that she had received a phone call from a man who gave his name as "George C. Beckett." According to Mrs. Jones, Beckett telephoned her from a pay phone (apparently in response to fliers issued by the victims' families in cooperation with the police) to say that he had seen one or both of the victims on August 24, 1982, at a truck stop in El Paso, Texas. Mrs. Jones notified Detective Grace of the phone call, and Grace noted the telephone number in the missing persons file. The record reveals that Grace called the number five times, but there was no answer.

According to Detective Grace, a second caller, who identified herself as "Sandy Maren," told Grace that she thought she saw one of the missing girls at a discotheque in Orange County. Maren told Grace that she

frequented the disco every night and she agreed to call Grace if she saw the girl again. Grace did not ask Maren for her address.

Although Grace filed the information in the missing persons file, he never heard from either Beckett or Maren again, and subsequent attempts by the police department and the defense to contact the witnesses failed. Defendant argues that locating both witnesses was crucial to his case because all that connected the victims to the case was their identification made with dental charts. Defendant theorizes that because the precise time and date of the deaths was unknown, it is conceivable that the girls were killed by someone else after they were seen alive by the above two "witnesses" and brought to the desert where they were buried. In this context, defendant speculates that these "potential witnesses" could have "totally exonerated" defendant by showing that the victims did not die at the time assigned by the prosecution and Hernandez.

In *Hitch*, we determined that the People's duty to preserve evidence applies whenever there exists a "reasonable possibility" that the evidence would have been material and favorable to defendant "on the issue of guilt or innocence." (12 Cal.3d at p. 649). In *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528], the United States Supreme Court addressed the People's affirmative duty to preserve evidence under the due process clause of the Fourteenth Amendment. The high court imposed a standard different from *Hitch*: "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality [citations], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta, supra,* 467 U.S. at pp. 488-489 [81 L.Ed.2d at p. 422]; see *In re Michael L.* (1985) 39 Cal.3d 81 [216 Cal.Rptr. 140, 702 P.2d 222].) The *Trombetta* court also recognized that the same test applies to prosecutorial disclosure cases, noting that although a similar requirement of materiality exists in such cases, there is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. (467 U.S. at p. 488, fn. 8 [81 L.Ed.2d at p. 422].)

We recognized recently in *People v. Johnson* (1989) 47 Cal.3d 1194, 1234 [255 Cal.Rptr. 569, 767 P.2d 1047], that because the *Hitch* formulation of the duty-to-preserve test was premised on federal due process, the federal test set forth in *Trombetta* should prevail. We also held in *Johnson* that our

adoption of the *Trombetta* rule is "compelled by the Truth-in-Evidence provision of Proposition 8." (*Johnson, supra,* 47 Cal.3d at p. 1234.)

Under the *Trombetta* test, we cannot characterize as "exculpatory" or "substantially material" the telephone calls (one of which originated from a telephone booth) of two people claiming they may have seen the victims after the alleged murders. Moreover, as the People observe, the police here actually preserved the names and phone numbers of the two alleged witnesses. Defendant's true complaint is that the police failed to adequately *investigate* the callers' information and thus failed to obtain material evidence that would exculpate defendant. Because we find that the authorities acted reasonably in preserving the names of the witnesses, we believe the court properly denied defendant's *Hitch* motion.

Moreover, this is not, as defendant claims, a case in which the court should impose sanctions for failure to obtain evidence, or destruction of evidence already obtained. (*People* v. *Zamora* (1980) 28 Cal.3d 88 [167 Cal.Rptr. 573, 615 P.2d 1361] [sanction imposed to deter systematic destruction of police records].) As the People point out, the record reveals Grace pursued his investigation of the case with reasonable diligence, turning over the missing persons file to the defense investigator on request. We see no evidence of a failure on the part of the prosecution to preserve material evidence that would warrant either dismissal or the imposition of sanctions in this case. (See *Zamora, supra,* 28 Cal.3d 88, 99.)

## I. *Hearsay Testimony*

Defendant claims the trial court erroneously excluded, on hearsay grounds, the testimony of Donald Hemmer, Kreuger's boyfriend. Hemmer would have testified that several days after Kreuger's disappearance, while defendant and Hernandez were being interviewed by Detective Shave of the Garden Grove Police Department, Hemmer received a phone call from a man who identified himself as "Doug." The record shows that defense counsel's offer of proof indicated that the caller asked about Kreuger, and then said, "I think that's one of the chicks that went to Arizona with Beth." Counsel told the court that he was not offering the testimony to prove that another "Doug" killed the victims but rather to substantiate Karen Bobie's testimony that in September 1982 she had seen Kreuger and Jones in the company of a large 35-year-old man with dark hair in the parking lot of the Garden Grove Mall and to show "that this contact did take place."[14]

---

[14] Bobie testified that although she had never talked to Kreuger, she had seen her twice (once with Donald Hemmer and once in the company of mutual friends) before Kreuger's disappearance and that she had never actually met Jones.

The court excluded the testimony on the ground that it was hearsay. The court relied on the rule that "[e]vidence of a declarant's statement that is offered to prove, not the truth of the matter that is stated in such statement expressly, but the truth of the matter that is stated in such statement by implication, is hearsay evidence." (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 1.2, p. 31.) The court noted that Hemmer's testimony was offered to show "Number one, that [the caller was] the Doug that we've all been talking about . . . ; that the girls [were] in Arizona or went to Arizona at or about this time when Mr. Douglas is accused of having taken them to the desert."

Our review of the record shows that the court properly excluded the testimony on hearsay grounds and that none of the various hearsay exceptions applies. (Evid. Code, § 1250.) As we recently stated in *People* v. *Ruiz* (1988) 44 Cal.3d 589, 608 [244 Cal.Rptr. 200, 749 P.2d 854]: "Section 1250, subdivision (a), of the Evidence Code creates an exception to the hearsay rule for evidence of a declarant's statements regarding his or her then existing state of mind or emotion, when the *declarant's* state of mind or emotion is at issue in the case, or when the evidence is offered to prove or explain the *declarant's* acts or conduct." (Italics in original.) No such exception could be met in the present case, in which the declarant's state of mind was not in issue, and the only value to the evidence might be to strengthen an inference that someone other than defendant killed Kreuger and Jones. Accordingly, we find no error in the court's decision to exclude that portion of Hemmer's testimony regarding the phone call from a person identifying himself as "Doug."

J. *Jury Instructions*

1. *CALJIC Nos. 8.11 and 8.31*

During deliberations on the guilt phase, the jury requested copies of the instructions regarding first and second degree murder and the special circumstance of multiple murder. After stating for the record that both parties agreed to provide the jury with the requested instructions, the court admonished the jury that it was not to consider portions of the instructions that had been deleted, and that it was to follow all handwritten directions noted by the court in the margins of the instructions. Pursuant to this request, the jury was given a copy of a CALJIC instruction on malice (No. 8.11 (4th ed. 1979 bound vol.)) that (i) differed from the instructions read aloud by the court, and (ii) contained substantial deletions and annotations.

Defendant claims the written malice instruction given to the jury under the 1979 edition of CALJIC No. 8.11 was a "misstatement of law"

and hence prejudicial because it failed adequately to inform the jury that it must find defendant had a subjective appreciation of the risk involved.[15] Defendant asserts the jury was given a written form of the instruction that included only the "wanton disregard for human life" definition of implied malice. Such an instruction, defendant claims, erroneously allowed the jury to find implied malice without finding defendant had a subjective or conscious awareness of the risk involved when he committed the crimes.

We disagree. We recently held in *People* v. *Dellinger* (1989) 49 Cal.3d 1212, 1221 [264 Cal.Rptr. 841, 783 P.2d 200], that the "wanton disregard for human life" definition of implied malice in CALJIC No. 8.11 adequately conveyed to the jury that it must find defendant had a subjective appreciation of the life-threatening risk created by his actions.[16]

In a related argument, defendant claims the jury was misled because the court, in addition to reading the 1979 version of CALJIC No. 8.11, erroneously read the 1983 edition of the second degree murder instruction (CALJIC No. 8.31) that, unlike the 1979 version of CALJIC No. 8.11, contained an alternative definition of malice in the disjunctive. Defendant argues that providing the jury with a written version of the 1979 instruction (CALJIC No. 8.11) in conjunction with reading the 1983 version of CALJIC No. 8.31, misled the jury as to its charge.[17]

Because we held in *Dellinger* that the 1983 versions of both CALJIC Nos. 8.11 and 8.31 conveyed to the jury that it was obligated to find a defendant

---

[15] The jury was given the written version of the first half of the instruction as follows:

" 'Malice' may be either express or implied

"[Malice is express when there is manifested an intention unlawfully to kill a human being.]

"[Malice is implied [when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life] [or] [when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life].]

[16] Although we recognized in *Dellinger* that in the future the better practice is "to charge juries solely in the straightforward language of the 'conscious disregard for human life' definition of implied malice as reflected in the 1988 revision of CALJIC No. 8.11" (49 Cal.3d at pp. 1221-1222), we nonetheless found either portion of the former instruction sufficient to inform the jury that it must find a subjective awareness of the risk on a defendant's part before it could find a defendant guilty of murder.

[17] The second degree murder instruction read as follows: "Murder of the second degree is also the unlawful killing of a human being as the direct causal result of an intentional act, involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life, or the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for human life." (CALJIC No. 8.31 (1983 rev.) (4th ed. pocket pt.).)

had subjective knowledge of the risk involved in his conduct, we find the jury was not misled when the court read the *entire* version of CALJIC No. 8.31 even though the jury was thereafter provided with only the first half of CALJIC No. 8.11 during its deliberations.

### 2. *Admonishment to Jury*

 Finally, defendant asserts the special circumstance instructions were confusing because the court had struck paragraphs four through six of one multiple-murder special-circumstance instruction (CALJIC No. 8.80 (1984 rev.) (4th ed. pocket pt.)) and had written notes in the instruction's side margins. Defendant contends the court committed prejudicial error by allowing the jury to see the portions of the instruction that had been rejected by the court after failing to provide a proper admonition to the jury that it should not engage in speculation on why the changes had been made. Defendant makes a similar argument regarding the malice instruction (CALJIC No. 8.31 (1983 rev.) (4th ed. pocket pt.)) that was modified. We consider both arguments together.

Defendant's authority fails to support his assertion that the court erred in permitting the deleted instructions to be taken into the jury room. The jury was admonished not to consider the deleted material.[18] Moreover, defense counsel did not request that the jury be given clean copies of the instructions nor did he object to the written instructions going to the jury. (See *People* v. *Bloyd* (1987) 43 Cal.3d 333, 355 [233 Cal.Rptr. 368, 729 P.2d 802].)

We observed in *Bloyd* that section 1137 allows instructions to be taken into the jury room. *Bloyd* noted that "it would be preferable if the jury was not presented with copies of the 'working' instructions, but rather had before it a verbatim rendition of the judge's actual comments." (43 Cal.3d at p. 356.) Nonetheless, we there found no error had been committed in allowing the jury to take working instructions into the jury room and specifically stated that "[i]t must be remembered . . . that the jury can ask for a rereading of any instruction which gives it pause." (*Ibid.*) As the

---

[18] Prior to giving the jury the written instructions, the court provided the following admonishment: "All right. What I have done, ladies and gentlemen, with the consent of both the defense and prosecution, is pull those series of definitions and instructions I have in my hand here, and I intend to let you take them back in the jury room with you. But let me admonish you that, for example, you will see in this particular instruction here there's some red lined, and also down at the bottom, although it is not quite as clear from that distance, there's some black lined out material, and that occurs in a number of these instructions. You are not to consider all the lined out material. Don't read through it. Just flat out don't consider it. Okay. . . . So as I said before, once again, I will admonish you not to read that which is lined out unless it says 'Read it.'"

People observe, here there is no indication the jury was confused by the instructions as given. Accordingly, we find no error.

### K. *Defendant's Absence at Reading of Testimony*

■ Defendant asserts he was deprived of his right to be personally present during the reading of some guilt phase testimony. ■ The right to presence and the companion right to confront and cross-examine witnesses are embodied in the Sixth and Fourteenth Amendments of the federal Constitution. (*Bustamante* v. *Eyman* (9th Cir. 1972) 456 F.2d 269, 272.) As defendant observes, he has a constitutional right to be present at trial under the state Constitution (Cal. Const., art. I, § 15). The application of the statutory implementation (§§ 977, 1043) and decisional law that provide a right to presence in California are summarized in *People* v. *Jackson* (1980) 28 Cal.3d 264, 309-310 [168 Cal.Rptr. 603, 618 P.2d 149], in which the defendant was absent from an in-chambers hearing on a motion for mistrial: "The cases which have interpreted sections 977 and 1043 uniformly have held that the accused is not entitled to be personally present either in chambers or at bench discussions which occur outside of the jury's presence on questions of law or other matters in which defendant's presence does not bear a ' "reasonably substantial relation to the fullness of his opportunity to defend against the charge." ' [Citations]. Stated in another way, '[W]hen the presence of the defendant will be useful, or of a benefit to him and his counsel, the lack of presence becomes a denial of due process of law.' [Citations.] The burden is upon defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial." (*Ibid.*; see also *People* v. *Hovey* (1988) 44 Cal.3d 543, 585 [244 Cal.Rptr. 121, 749 P.2d 776].)

The day after deliberations began, the jury requested the court to read the testimony of Lee (who testified about introducing victim Kreuger to defendant), Akers (an alibi witness who claimed to have spoken to defendant between 5 and 6:30 a.m. on the day of the murders), Tieffer (who rebutted Akers's testimony) and Hemmer (who was called as a defense witness and testified regarding his efforts to locate Kreuger). Defendant was not present at the reading, although defense counsel was present. ■ As the People observe, defendant cannot demonstrate that his absence during the reading of the above testimony prejudiced his case or denied him a fair trial. (*Hovey, supra,* 44 Cal.3d at p. 585.)

Defendant claims his presence would have ensured the reading was accurate and detected "whether any distortion of the testimony occurred in the jury room." Defendant also argues that had he been present, his "knowledge of the facts of the case would have aided counsel in presenting a factual

argument that the reporter's reading did not accurately reflect the testimony [and that] he could have advised his counsel on the differences between the testimony as filtered through the court reporter's reading and the testimony as originally given." Finally, defendant argues that had he been present "the jury might have drawn conclusions from [his] demeanor during the testimony that it could not have drawn in his absence." After considering the nature of the matter and reviewing the record, we find defendant has failed to demonstrate prejudice. (*Hovey, supra*, 44 Cal.3d at p. 585.)

Like *Hovey*, the record here merely shows the court reread the testimony of four witnesses to the jury (two prosecution and two defense witnesses), and defendant does not argue that anything else, in addition to the rereading, took place that would have prejudiced his right to a fair and impartial trial. As we stated in *Hovey*, "The rereading of testimony ordinarily would not be an event which bears a substantial relation to the defendant's opportunity to defend, and nothing in the present record indicates that defendant's personal presence would have assisted the defense in any way. Defendant's suggestion that the jury might have been favorably influenced by defendant's reactions to the reread testimony . . . is entirely speculative and fails to carry his burden of establishing prejudice." (44 Cal.3d at p. 585.)

Finally, defendant argues that counsel could not waive his right to be present at the reading of testimony. Although we can only surmise from this record that counsel indeed waived defendant's presence, defendant's absence, even without waiver, was not prejudicial because the reading of testimony did not have a reasonably substantial relation to the fullness of defendant's opportunity to defend against the charge. (*People v. Garrison, supra*, 47 Cal.3d 746, 782-783; *People v. Rich* (1988) 45 Cal.3d 1036, 1105 [248 Cal.Rptr. 510, 755 P.2d 960].)

### L. *Counsel Motions*

#### 1. *No Denial of Right to Testify*

Following the guilt and special circumstance phases of the trial and prior to the penalty phase, defendant filed an ex parte motion for substitute counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]. In support of his motion, defendant filed a declaration that listed his principal complaints against Peters, his defense counsel. Defendant included in this list a complaint that counsel "did not fully explain to defendant what was happening in regards to the defendant's charges— upcoming trial and during the trial. Due to the defendant's ignorance and

only having a total of seven (7) years of grammar school. Defendant was not aware of the fact that he would not testify for his own defense and to aid in his defense. Defendant wanted the opportunity to counteract the lies of the prosecution witnesses. Defendant was denied his right of freedom of speech by the defendant's counsel."

██ Before we address the *Marsden* claim, we first consider defendant's related argument that his conviction should be reversed because defense counsel failed to advise him of his fundamental right to testify on his own behalf, despite defendant's repeated requests that he take the stand. (See *People* v. *Robles* (1970) 2 Cal.3d 205, 214-215 [85 Cal.Rptr. 166, 466 P.2d 710] [defendant who timely demands to take stand contrary to advice of counsel has right to give exposition of defense before jury].)

In analyzing defendant's *Robles* claim, we recognize that this issue is distinct from the issue whether trial counsel provided competent representation in his tactical choices. Thus, in discussing the present contention, we assume counsel's decision to exclude defendant's testimony fell well within the acceptable range of competency. (See *People* v. *Frierson* (1979) 25 Cal.3d 142, 158 [158 Cal.Rptr. 281, 599 P.2d 587].)

We are satisfied by counsel's explanation on the record that he did not keep defendant from testifying, nor did defendant insist during the guilt phase that he wanted to testify. Rather, it appears that during trial, defendant actually *agreed* with counsel that testifying would not be in his best interest and, indeed, would open the door for the prosecution to present damaging character evidence in rebuttal. In addition, the record shows that throughout the trial, defendant was in full accord with counsel's decision that he not testify. Accordingly, it appears that contrary to defendant's statements in his *Marsden* motion, he was well aware of his right to testify on his own behalf (*Robles, supra,* 2 Cal.3d at pp. 214-215) but decided, on the reasonable advice of counsel, that exercising the right at trial would not have been in his best interest. We cannot now second-guess his decision to accept counsel's reasonable tactical choice. Accordingly, we find no error under *Robles, supra,* 2 Cal.3d at pages 214-215.

2. *No Error in Denying Marsden Motion*

██ We also find the court properly denied defendant's motion for substitute counsel (*Marsden, supra,* 2 Cal.3d 118, 124). Defendant's list of complaints against counsel focused on tactical decisions counsel made before or during trial in order to further the defense. Defendant's complaints regarding the inadequacy of counsel included, among others, counsel's failure to call a waitress from the Borrego Springs bar where defendant and

Hernandez stopped to have a drink before disposing of the victims' bodies,[19] and decisions by counsel to keep several "witnesses" from testifying, including defendant's alcoholic wife and an "eyewitness" who, before trial, recanted his statement that he was with defendant on the day of the murders and with whom defendant had made a film depicting the rape of a woman by two men. Defendant also criticized counsel for not proffering certain evidence, including medical evidence of defendant's gout and his lack of equilibrium, and evidence of his prior service as a marine. Defendant also complained about counsel's failure to present a police report showing that he called the police two days after the victims disappeared and stated that he would "come down and get this squared away."[20]

In ruling on defendant's in camera *Marsden* motion, the court referred to the "alleged incidences of incompetence" listed by defendant in his declaration, and found all such incidences to be proper trial tactics. The court told defendant: "As I told you before, Mr. Douglas, I think that the indications or those facts which you related to me would be better brought at the termination of the penalty phase in your automatic motion for new trial. . . . [¶] The alleged 'incidences' of incompetence, what have you, [are not incompetence] but trial tactics, which [are] the prerogative of the trial attorney. . . . [¶] And if your motion is to have new counsel, which I take it is for the penalty phase, then that motion is denied, sir."

Our review of the *Marsden* hearing reveals the court properly denied the motion. (*People* v. *Moore* (1988) 47 Cal.3d 63, 76 [252 Cal.Rptr. 494, 762 P.2d 1218].) As we confirmed in *Moore*, the decision to allow a substitution of attorney is within the sound discretion of the trial court as long as the court allows defendant the opportunity to enumerate specific examples of inadequate representation. (*Ibid*.) The record shows the court here specifically considered each of defendant's reasons for requesting a new attorney for the penalty phase, and reasonably found that defendant's claims were either unsubstantiated or resulted from a postverdict disagreement with proper tactical decisions made by counsel during the guilt phase of the trial. Accordingly, the *Marsden* motion was properly denied.

---

[19] The record indicates the witness would not have aided the defense. Apparently, during an interview with Mr. Hallihan, defense counsel's investigator, the bartender told him that the bar did not open until 11 a.m. Contrary to defendant's statements that Hernandez's testimony stated the two arrived at the bar at 9:30 a.m., Hernandez testified on direct examination that he and defendant arrived at the bar in Borrego Springs at 12:30 p.m., an hour and a half *after* the bar opened.

[20] During the hearing, defense counsel stated that the investigator in charge of the case, Mr. Shane, indicated the police had no record of ever receiving such a phone call from defendant.

### 3. *Keenan Motion Properly Denied*

In a related contention, defendant asserts the court erred in denying a second attorney to assist in preparing his *Marsden* motion. Defendant's trial counsel prepared, on defendant's behalf, a "motion for appointment of independent counsel for *Marsden* evaluation," pursuant to *Keenan v. Superior Court* (1982) 31 Cal.3d 424, 430 [180 Cal.Rptr. 489, 640 P.2d 108], as a precautionary measure and, according to counsel, "in light of the inability of present counsel to consider, without conflict of interest, any incompetence claims on the defendant's motion for new trial."

In denying the motion, the court noted defendant's in propria persona *Marsden* motion adequately informed the court of his complaints regarding counsel, rendering unnecessary the appointment of another attorney to assist defendant in preparing a new *Marsden* motion. The court was also concerned with delay, and found defendant had raised no compelling reason for the assistance of additional counsel. We agree, and find the court did not abuse its discretion in denying the *Keenan* request. (See *Moore, supra,* 47 Cal.3d at pp. 76-77.)

### III. PENALTY PHASE ISSUES

### A. *Improper Voir Dire*

### 1. *Improper Death Qualification*

Defendant contends the judgment should be reversed because the court gave each juror copies of the proposed "death qualification" voir dire questions prior to individual questioning. He asserts this violated our decision in *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301], in which we explained that death qualification of a jury panel in open court could desensitize the jury to its sentencing responsibility. (See also *Balderas, supra,* 41 Cal.3d 144.) Defendant argues that by allowing the jurors to review the voir dire questions in advance, the court erroneously permitted potential jurors to discover a pretext on which they could be excused or, conversely, on which they could serve as a panel member while harboring a predisposition to automatically vote for death. Defendant concedes that, unlike the *Hovey v. Superior Court* and *Balderas* jurors, the jurors in this case were sequestered and individually questioned during the death qualification process. Nonetheless, defendant asserts the prejudicial effect of allowing the potential jurors advance notice of the voir dire questions is analogous to conducting voir dire in an open courtroom with the entire jury panel present. We disapproved such a procedure in *Hovey v. Superior Court, supra,* 28 Cal.3d 1, in favor of sequestered voir dire

in order to "minimize each juror's exposure to the death-qualifying voir dire of others." (*Id.* at p. 81.)

After swearing in the jury panel, the court here explained the decision-making process to the panelists: It stated that if defendant was convicted of first degree murder and the special circumstance was found true, the jury would then decide penalty. Next, the court noted that it was "required to ascertain if there are any prospective jurors who entertain such a conscientious opinion regarding the death penalty that would preclude his finding the defendant guilty of murder in the first degree if the evidence should justify such a finding and/or would preclude his or her finding of the truthfulness as to one or all of the special circumstances alleged if the evidence should justify such a finding or findings and/or if the juror, because of his conscientious objection to the death penalty would, under no circumstances, vote for a verdict of death." The court then explained, "The converse of that, that is, do we have any prospective juror who has such a conscientious opinion regarding the two possible verdicts that he would automatically and in every case vote for a verdict of death and under no circumstances vote for a verdict of life imprisonment without the possibility of parole. If you entertain any such conscientious opinion, the law provides that you will not be permitted or compelled to serve as a juror in this case." The court then read the panel the four questions each of them would be asked during sequestered questioning.

We are not persuaded that the advance notice to the jury of the death qualification questions caused it to become death prone. Moreover, defendant has cited no evidence or persuasive logic suggesting that a court could induce guilt or death-prone bias simply by giving prospective jurors advance notice of the voir dire questions. Nor has he cited evidence indicating the jurors ignored the court's instructions to refrain from discussing the case outside the courtroom. We conclude there is no reasonable possibility the jury was so "bombarded" with death penalty questions and instructions as to impair its impartiality.

Finally, the court consistently advised the individually questioned sequestered jurors that the penalty phase would not be reached unless defendant was first found guilty of first degree murder with special circumstances. The court also stated that the penalty determination, if one was necessary, would be in the jury's discretion. The court's voir dire questions were similarly framed. As discussed in *Hovey* v. *Superior Court, supra,* 28 Cal.3d at page 80, the purpose of individualized sequestered voir dire is to minimize the potentially prejudicial effects of exposing jurors to excessive pretrial discussion and questioning about the penalty phase. Specifically, "a reduction in the pretrial emphasis on penalty should minimize the tendency of

a death-qualified jury to presume guilt and expect conviction." (*Ibid.*) By questioning prospective jurors individually, the court prevented them from being improperly influenced by their fellow panelists. (*Id.* at p. 74.) Accordingly, we find no reasonable possibility that reading the court's questions in advance prejudiced the jury's impartiality under these facts. (*Balderas, supra*, 41 Cal.3d 144, 191.)

### 2. *Witt/Witherspoon Error*

 Two prospective jurors stated during the sequestered voir dire that they could not vote for the death penalty. Defendant asserts their exclusion resulted in a jury that was unduly death prone. (*Witherspoon v. Illinois* (1968) 391 U.S. 510, 521-523 [20 L.Ed.2d 776, 784-785, 88 S.Ct. 1770].) In support, he relies on *Witherspoon*'s mandate that a juror cannot be excluded for views against the death penalty unless he makes it "unmistakably clear" that those views would force him to vote against death regardless of the instructions or the evidence, or would prevent him from judging fairly defendant's guilt or innocence. (391 U.S. at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785].)

The United States Supreme Court restricted *Witherspoon* in *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], holding that a juror need not make his attitude against the death penalty "unmistakably clear" in order to be properly excluded; rather, *Witt* held, the correct standard for exclusion is whether a prospective juror's views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" (469 U.S. at p. 424 [83 L.Ed.2d at p. 852].) We recently adopted the *Witt* standard in *People v. Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250], and have applied the standard in subsequent cases. (See *People v. Guzman* (1988) 45 Cal.3d 915, 955 [248 Cal.Rptr. 467, 755 P.2d 917].)

Our review of the voir dire shows that each of the two challenged jurors expressed views that made it clear that he would feel forced to vote against death regardless of the law or evidence presented.[21] Thus, their exclusion

---

[21] Each juror stated that he would never vote for the death penalty, under any circumstances. For example, the first disqualified juror had the following responses:

"Q. [By the prosecutor] . . . is it your opinion that the death penalty is never justified in a case, should never be given?

"A. Yes. I do believe that. . . .

"Q. What I would like to ask you is, is there any case where you would ever vote for the death penalty as opposed to life without possibility of parole?

"A. No, I wouldn't vote for the death penalty in any case."

The second disqualified juror responded to questioning in a similar manner:

was proper under *Witt*'s holding that jurors may be excluded once the court has determined from their responses that their views would have substantially impaired their performance as jurors at the penalty phase. (*Witt, supra,* 469 U.S. at p. 424 [83 L.Ed.2d at pp. 852-853]; *Guzman, supra,* 45 Cal.3d at p. 956.)

## B. *Other Criminal Activity*

Defendant claims it was error to permit the jury to consider several instances of prior criminal activity under section 190.3, factor (b), which allows the sentencing jury to consider "the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." We address each claim separately.

### 1. *Testimony of McGettrick and Pendleton*

In 1976, Julie McGettrick worked for defendant at a cocktail lounge called the Villa D'Italia in Orange County. McGettrick testified that defendant approached her with a proposition that she join him in convincing young girls to pose for photographs and then killing and dismembering the unsuspecting victims. To this end, defendant drove McGettrick to Yucca Valley in search of a location to commit his acts. McGettrick testified that defendant told her he wanted the girls "to be cut up, bleeding but still conscious. . . ," and that her role in the act would be simply to appear in the photographs defendant planned on taking once he tortured the girls. Although McGettrick testified that she posed nude for defendant during the trip to the desert, she said she did so out of fear. Defendant had shown her a gun in the car before she removed her clothes and the photos were taken next to the car. McGettrick testified that she followed defendant's instructions to pose for the photos because she feared defendant was going to grab the gun and use it on her.

A few days later, McGettrick approached Vickie Pendleton, another employee at the Villa D'Italia, and asked if she would be interested in

"Q. . . . . Are you telling us . . . that you have feelings of morality that would not enable you to vote for the death penalty in any case?

"A. Yes.

"Q. And regardless of the evidence you would not vote in favor of the death penalty?

"A. That's right."

"Q. [By the court] In your [(the juror's)] opinion, there is no case, no matter how heinous the crime may be, and no matter how guilty the party may be, you would never vote for the death penalty?

"A. I would vote for life without parole.

"Q. And never for the death penalty?

"A. Never."

posing for defendant. Pendleton, McGettrick and defendant agreed to drive to the desert for a photography session, but when Pendleton and defendant arrived at McGettrick's motel, she refused to answer the door.

Pendleton and defendant drove to Yucca Valley. There, Pendleton testified, defendant "got me from behind with a rag and I guess it was ether and he drugged me and I passed out. . . ." When Pendleton regained consciousness, defendant was standing about two feet in front of her with a pistol in his hand.

Pendleton then asked defendant why he was doing this to her. According to Pendleton, defendant "put the gun to my head and said I better urinate on him or he [was] going to kill me." Pendleton stated she was so nervous that she could not urinate. Defendant then forced Pendleton to orally copulate him. Pendleton testified she convinced defendant that she would help him in his plan to torture women and send photos of the activity to Canada, where they allegedly would be bought. Thereafter, defendant gave Pendleton $50 and let her go after she told him she was sick from the ether and she would contact him in a day or two. Pendleton never saw defendant again.

### 2. *Asserted Boyd Error*

In *People* v. *Boyd* (1985) 38 Cal.3d 762, 773-776 [215 Cal.Rptr. 1, 700 P.2d 782], we examined section 190.3 and concluded that at the penalty phase: "Evidence of defendant's background, character, or conduct which is not probative of any specific listed factor would have no tendency to prove or disprove a fact of consequence to the determination of the action, and is therefore irrelevant to aggravation." (38 Cal.3d at p. 774.) ██ Defendant argues the trial court committed reversible error by allowing McGettrick and Pendleton to testify about criminal activity under section 190.3, factor (b), and that the court should have ruled their testimony inadmissible as not bearing on any statutory factor in aggravation.

██ As the People observe, however, section 190.3 contemplates consideration of some aspects of a defendant's criminal history (see factors (b) [prior violent criminal activity] & (c) [prior felony conviction]), as long as the evidence is limited to conduct demonstrating the commission of an actual crime—e.g., the violation of a penal statute. In *Boyd*, we clarified the distinction between factors (b) and (c) of section 190.3, by making it clear that the 1978 statute permits the jury to consider, under factor (b), any violent criminal activity by the defendant, whether or not it led to prosecution and conviction, and under factor (c), any prior felony conviction, whether or not the underlying offense was violent. (*Boyd, supra*, 38 Cal.3d at p. 776.)

■ Thus, the prosecutor was entitled to present the testimonial evidence of McGettrick and Pendleton as evidence of "prior criminal activity" under factor (b) of section 190.3 even though defendant was never actually charged with a crime for this conduct.[22] Defendant's putting a gun to Pendleton's head and forcing her to orally copulate him (forcible oral copulation, assault with a deadly weapon, false imprisonment) and driving McGettrick to the desert, showing her a gun, and telling her to pose for nude photographs (false imprisonment, assault) were all either violent criminal offenses or implied the use or threat to use violence and thus were properly presented for the jury's consideration as aggravating circumstances under factor (b).[23]

### 3. Defendant's 1977 Arrest for Attempted Murder—Testimony of Pamela Sue Williams

#### a. Facts

Williams testified that she met defendant in July 1977 after he picked her up when she was hitchhiking in Santa Ana. Defendant gave her $50 after they talked for two hours in a bar. She told defendant her name was Debbie Adams.

During their conversation, defendant told Williams that he wanted to make snuff movies, using Williams to find young girls, preferably aged 13 to

---

[22] We note the jury was instructed that it could not consider the other criminal offenses unless it was "convinced beyond a reasonable doubt that the defendant committed them." (See *People* v. *Robertson* (1982) 33 Cal.3d 21, 53-54 [188 Cal.Rptr. 77, 655 P.2d 279].) During his closing argument, the prosecutor further emphasized the jury's role in considering Pendleton's testimony about other criminal activity, by informing the jury that: "There's been some substantial cross-examination of her testimony and there's some pictures that were offered and, frankly, it seems reasonable to look at it and to have a reasonable question or a reasonable doubt as to whether or not Vickie Pendleton was forced into the situation she talks about being in.

"Now, don't get me wrong. I am not saying Vickie Pendleton is being untruthful; just saying that as you look at her testimony without other corroborating evidence, there might well be a reasonable doubt as far as that goes. . . ." Far from conceding the lack of evidence to the above crime, as defendant claims, the prosecutor was emphasizing the jury's role in considering the other-crimes evidence to ensure reliability of the jury's penalty determination.

[23] The People also observe that defendant made no objection to the other-crimes evidence on the ground that the evidence did not relate to one of the statutory factors. Instead, the record reveals defendant objected only to the portion of Pendleton's testimony that explained to the jury defendant's plan to include her in a scheme that involved "picking up hitchhikers and taking them out to the desert and torturing them. . . ." Defendant objected on the ground the testimony was not relevent to section 190.3, but the objection was overruled by the trial court.

Defendant now claims counsel was ineffective for failing to object to McGettrick's testimony. Because we find the evidence was properly considered by the jury under section 190.3, factor (b), we do not separately consider defendant's claim of ineffectiveness.

14 years old, but would settle on a 25 year old. Defendant wanted Williams to torture the girls while he took the pictures. He promised Williams that she would be paid $1,000 for her effort. Defendant told Williams that the film would be sent to Canada for developing and then distributed in the United States from Mexico.

Williams eventually told the police about her conversation with defendant because she had a 13-year-old daughter, and she "got a feeling this guy was for real." Williams agreed to cooperate with the police in investigating defendant and agreed to wear a tape-recording device and introduce two policewomen (Baucom and Reynolds) to defendant as potential victims. Williams then introduced the policewomen to defendant, who told his potential "victims" that he wanted them to act in a lesbian film he was making in the desert "past Palm Springs." Defendant offered to pay the officers $500 apiece to participate in approximately 120 photographs. Baucom and Reynolds agreed to meet Williams and defendant the next day at the Two Guys parking lot in Garden Grove to implement their plan.

The next morning, defendant and Williams conversed for about 20 minutes in the Two Guys parking lot before the undercover agents arrived. Williams had been wired to record the conversation, which included a gruesome discussion by defendant of his plan to torture and then film his intended victims' agony. During the conversation, defendant also instructed Williams on how to tie the victims, and gave her a pistol to place in her purse. He told her that he also had a rifle in his car.

After the agents arrived, defendant and Williams drove them to an area of San Bernardino County (off State Highway 247) known as "Old Ghost Road." Defendant was subsequently arrested and charged with attempted murder (§ 187), solicitation to commit a crime (§ 653f) and unlawful possession of a firearm (§ 12022) in connection with the incident. The information was amended twice and defendant was eventually charged with solicitation of murder, solicitation of assault with a deadly weapon and assault by force likely to produce great bodily harm and attempted murder.

In 1978, after the jury failed to reach a verdict in the above matter, the court declared a mistrial. Defendant pleaded nolo contendere to solicitation to commit certain enumerated crimes under section 653f—a felony subject to three years' imprisonment. The record reveals defendant understood the nolo contendere plea "shall be considered the same as a plea of guilty." Defendant was granted three years' probation with terms including one hundred fifteen days in custody, with credit for all days served.

Thereafter, in 1982, the court denied defendant's motion to reduce the felony to a misdemeanor, but granted his motion, pursuant to section

1203.4, to enter a plea of not guilty and dismiss the information based on his successful completion of probation.

At the penalty phase, defendant renewed his motion to exclude all evidence of the 1977 incident. The court concluded that defendant's criminal activity that eventually led to his pleading to a violation of section 653f and the imposition of a 115-day prison term (albeit later suspended after satisfactory completion of probation) amounted to the type of admissible prior criminal activity contemplated under section 190.3, factor (b).

Defendant now asserts the court erred in allowing the jury to consider the evidence. He claims the evidence should have been excluded because: (i) it violated double jeopardy and plea bargain principles, (ii) it was barred under section 1203.4, (iii) it was barred by the statute of limitations, (iv) the reporter's notes from the 1978 trial had been destroyed, (v) irrelevant physical evidence was introduced to corroborate Williams's testimony, and (vi) the 1977 crime did not involve violence or the threat of violence. As we explain, we find that none of defendant's contentions has merit.

b. *Double Jeopardy*

First, defendant's contention that double jeopardy principles preclude use of his 1977 crime during his penalty trial is without support. We agree with the People that constitutional guaranties against double jeopardy do not apply to subsequent trials when the prior offense is used as an enhancement, nor do such principles apply when the prior criminal activity is considered by the penalty jury as a proper aggravating factor under section 190.3, factor (b).

We rejected a similar claim in *People* v. *Melton* (1988) 44 Cal.3d 713, 754-755 [244 Cal.Rptr. 867, 750 P.2d 741], in which it was argued that prior "criminal activity" which was the subject of a plea bargain "should be inadmissible at a subsequent penalty trial [because] such offenses would subject [a defendant] to 'adverse sentencing consequences' beyond those agreed to at the time the bargains were entered." (*Id.* at p. 755.) There we held that section 190.3, factor (b), permits the jury to consider any violent criminal activity—including prior dismissed or bargained charges—and precludes consideration only of crimes for which a defendant was prosecuted and acquitted. (44 Cal.3d at p. 755; see also *People* v. *Sheldon* (1989) 48 Cal.3d 935, 949-952 [258 Cal.Rptr. 242, 771 P.2d 1330].) As *Melton* observed, "[a] bargained conviction or dismissal is not an 'acquittal' as described in section 190.3." (44 Cal.3d at p. 755.) Indeed, were defendant's argument "accepted in full, bargained convictions would not be admissible in any subsequent prosecution to enhance the punishment for the later

offense. None of the several statutes providing enhanced sentences for prior 'convictions' (see, e.g., §§ 667, 667.6) suggests such a limitation." (*Id.* at p. 756; see also *People* v. *Heishman* (1988) 45 Cal.3d 147, 193-194 [246 Cal.Rptr. 673, 753 P.2d 629].) We therefore reject defendant's contention because a plea bargain is not an acquittal under section 190.3. (*Melton, supra,* 44 Cal.3d at p. 755.)

Next, we reject defendant's related argument, made in reliance on *People* v. *Harvey* (1979) 25 Cal.3d 754, 758 [159 Cal.Rptr. 696, 602 P.2d 396], that introduction of the charges dismissed pursuant to a plea bargain violated the implicit understanding that he would suffer no adverse sentencing consequences because of the facts underlying the dismissed charges. We have rejected the identical contention in *Melton* and subsequent cases (*People* v. *Robertson* (1989) 48 Cal.3d 18, 47 [255 Cal.Rptr. 631, 767 P.2d 1109]), and for the reasons stated therein we reject defendant's claim.

c. *Section 1203.4*

Defendant's argument that section 1203.4 prohibited the jury from considering the underlying facts surrounding the solicitation is specious. Section 1203.4 merely allows a defendant to withdraw his plea of nolo contendere and enter a plea of not guilty once the conditions of his probation have been fulfilled. Contrary to defendant's contention, nothing in that section prohibits the jury in a capital case from considering the facts of the crime that gave rise to the offense. As we stated in *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301]: "When dealing with violent conduct it is not the *fact* of conviction which is probative in the penalty phase, but rather the *conduct* of the defendant which gave rise to the offense." (Italics in original.)

d. *Statute of Limitations*

Defendant also asserts that the prior violent activity was "stale," in the sense that it occurred more than seven years before the 1984 trial, and thus failed to satisfy the Eighth Amendment requirement that the penalty determination be reliable. (See *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 340 [86 L.Ed. 2d 231, 246, 105 S.Ct. 2633].) We disagree. We have consistently held that "[section 190.3, factor] (*b*) imposes *no* time limitation on the introduction of 'violent' crimes; the jury presumably may consider criminal violence which has occurred at any time in the defendant's life. . . . [¶] . . . [Factor] (b) allows in *all* evidence of *violent* criminality to show defendant's propensity for violence." (*Balderas, supra,* 41 Cal.3d at p. 202; see *People* v. *Ghent, supra,* 43 Cal.3d 739, 774.) In addition, the evidence was not stale simply because the prior activity occurred seven years before

defendant's 1984 trial. Instead, the evidence was relevant and reliable evidence of defendant's prior violent criminality. Accordingly, the jury's consideration of defendant's prior criminal activity was proper under the Eighth Amendment standard of reliability. (*Caldwell, supra*, 472 U.S. at pp. 340-341 [86 L.Ed.2d at pp. 246-247].)

 e. *Lost Reporter's Notes*

Evidence of the 1977 offense was declared inadmissible at the guilt phase as a prior similar act (Evid. Code, § 1101, subd. (b)) on the grounds that it constituted cumulative evidence and its probative value was outweighed by its prejudicial effect. (Evid. Code, § 352.) Another motion was brought to exclude the crime from the penalty phase on the ground that the reporter's notes of the 1978 trial, ending in a hung jury, had been routinely discarded in 1984 under the statutory authority of Government Code section 69955, subdivision (d). ■■■ Defendant now claims the prosecutor had a duty to preserve the notes (which were discarded after the arrest warrant in the present case had been issued for defendant) once he became aware that defendant was a prime suspect in a capital case. In addition, defendant asserts destruction of the notes substantially hindered his ability to cross-examine witnesses who had appeared at the 1978 trial. We disagree.

Defendant's argument rests primarily on the theory that the jurors who heard the 1978 case were unable to agree on a verdict and thus were not convinced of defendant's guilt. Therefore, defendant reasons, the reporter's notes contained exculpatory evidence that would have been useful in exposing the weaknesses in the prosecution's case.

Defendant's argument is misplaced. Destruction of a court reporter's notes, absent notice to the court indicating defendant wishes the notes preserved, is lawful. (Gov. Code, § 69955, subd. (d).) In any event, the discarding of the reporter's notes bore little relevance to the validity of the plea; indeed, defendant's ability to cross-examine witnesses was not affected by the absence of the notes, because, as the People observe, he had access to the preliminary hearing transcripts and police reports (including the tape recording he and Williams made in the parking lot on the day of the crime). (Cf. *Trombetta, supra*, 467 U.S. 479, 488 [81 L.Ed.2d 413, 421-422].) Accordingly, we find defendant was not prejudiced by the discarding of the reporter's 1978 trial notes.

 f. *Physical Evidence of 1977 Offense*

■■■ Defendant next asserts that a number of items of physical evidence (a saw, knives, cleaver, rope, tape and women's underwear), found in the

desert under a tarp in the sand within a few feet of where defendant apparently took the undercover policewomen, were erroneously admitted at the penalty phase as evidence of defendant's preparation in a plan to commit murder (defendant allegedly placed the items in the sand before returning to the same spot with the intended victims a few hours later). Defendant claims the evidence should have been excluded as substantially more prejudicial than probative under Evidence Code section 352.

Again, defendant's argument misconceives the court's role in admitting other-crimes evidence at the penalty phase. Permitting the People to rely on physical evidence of a crime ending in a plea of nolo contendere or a dismissed charge (here, attempted murder) falls within the scope of aggravating evidence the penalty jury may consider under section 190.3, subdivision (b) (*Ghent, supra,* 43 Cal.3d 739, 774), and its admissibility is not unduly prejudicial to the defendant, "for he is entitled to an instruction which requires that the jury find beyond a reasonable doubt that the offense was committed." (*Ibid.,* italics omitted; see also *Robertson, supra,* 33 Cal.3d 21, 53.) Such an instruction was given here.

Moreover, in *People* v. *Karis* (1988) 46 Cal.3d 612, 641 [250 Cal.Rptr. 659, 758 P.2d 1189], we stated that "the court does not have discretion to prevent introduction at the penalty phase of *all* evidence of . . . a prior violent felony." (*Id.,* at pp. 641-642, fn. 21, italics added.) Rather, the court retains discretion to regulate, under section 352, the manner in which the evidence is presented. (*Ibid.*) The evidence at issue here was not presented in an unduly prejudicial manner. Thus, because the items were admitted during the penalty phase to support the People's claim that the 1977 solicitation occurred beyond a reasonable doubt, we conclude the trial court correctly permitted its presentation at the penalty phase under factor (b) of section 190.3. (*Karis, supra,* 46 Cal.3d 612, at p. 641; *Melton, supra,* 44 Cal.3d 713; see *People* v. *Thompson* (1988) 45 Cal.3d 86, 128-129 [246 Cal.Rptr. 245, 753 P.2d 37].)

g. *Solicitation to Commit a Violation of Section 653f as Containing an Implied Threat of Force or Violence*

■ Defendant asserts that the court erred in allowing the jury to hear evidence of the prior solicitation because it did not involve force or violence or the threat of violence as required by section 190.3, factor (b). We disagree. As the trial court found, solicitation to commit a felony under section 653f involves the implied threat to use force or violence as required under section 190.3, factor (b). (See *People* v. *Phillips* (1985) 41 Cal.3d 29, 65-82 [222 Cal.Rptr. 127, 711 P.2d 423].)

### h. *Unanimity Instruction*

Defendant urges us to reconsider our holding in *Ghent, supra,* 43 Cal.3d 739, 773-774, that the jury's finding of prior uncharged criminal activity need not be unanimous. As in *Ghent,* the jury here was instructed that "in order to make a determination as to the penalty, all twelve jurors must agree." ▮ *Ghent* correctly found that there is "nothing improper in permitting each juror individually to decide whether uncharged criminal activity has been proven beyond a reasonable doubt and, if so, what weight that activity should be given in deciding the penalty." (*Id.* at p. 774.) We see no reason to reconsider that finding.

### C. *Sentencing Instructions*

### 1. *Brown*

▮ Defendant contends that the mandatory sentencing formula of section 190.3 together with the prosecutor's closing argument withdrew from the jury its constitutionally compelled sentencing discretion. He relies on our penalty judgment reversal in *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1036 [254 Cal.Rptr. 586, 766 P.2d 1] (and cases cited), to support his argument that the jury was misled with respect to the proper context of the weighing process and its discretion to determine the appropriate penalty. Based on the instructions and arguments, however, we conclude the jury was not misled about its role in determining the appropriateness of death under our interpretation of the weighing process in *People* v. *Brown* (1985) 40 Cal.3d 512, 538-545 [220 Cal.Rptr. 637, 709 P.2d 440].

In *Brown,* we concluded that the directive of section 190.3 (that the trier of fact "shall impose a sentence of death" if it "concludes aggravating circumstances outweigh the mitigating circumstances") did not impermissibly restrict the jury's constitutional sentencing discretion. We observed, however, that the statutory "shall" language was potentially confusing concerning the jury's role, and thus we directed that future juries be further instructed on the scope of their sentencing discretion. In addition, we stated that each case decided before *Brown* "must be examined on its own merits to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (40 Cal.3d at p. 544, fn. 17.)

As we stated in *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1277 [232 Cal.Rptr. 849, 729 P.2d 115], our concerns in *Brown* were essentially two: first, giving the jury the unadorned former CALJIC No. 8.84.2 instruction might lead the jury to misunderstand that its weighing and decisionmaking

responsibility required a mere mechanical counting of factors on each side of an imaginary scale. Our second concern was that use of the word "shall" might mislead the jury to return a death sentence without having questioned whether, in the personal moral judgment of each juror, death is the appropriate punishment. (42 Cal.3d at pp. 1276-1277; *Guzman, supra,* 45 Cal.3d at p. 958.)

Our examination of the record indicates a reasonable jury would have understood its proper role in determining penalty. Although it heard the standard "shall" instruction, it also received additional special instructions requested by defendant. First, the jury was told that aggravating factors were strictly limited by statute and must be proved beyond a reasonable doubt, whereas any mitigating factor "could, standing alone, be sufficient to justify a sentence of life imprisonment without the possibility of parole if you find that it outweighs the circumstances in aggravation." The jury was also told that "the weight to be given to the circumstances in mitigation and aggravation is a matter for you to decide."

Moreover, both the prosecution and the defense stressed to the jury the normative nature of the weighing process and cautioned that it alone was to decide penalty. For example, in explaining the individual nature of the weighing process, the prosecution told the jury: "Now, obviously you can't say, 'well, this factor is worth three pounds; and this one is worth five ounces, and this one is worth that much," while the defense warned the jury that its job was "to weigh the factors, not count them."

Defendant objects to the fact that during his concluding argument, the prosecutor told the jury: "This isn't a close question. What you have with these factors is aggravation, aggravation, aggravation, and you really don't have any mitigation. [¶] So I submit to you that there is no alternative here. The only—if you follow the law in the case, if you listen to the instructions and you follow the guidelines given to you by the court, there is no possibility of a different verdict. The only proper verdict following the law and following the guidelines is the death penalty."

Defendant argues that the above comments may have misled the jury as to the scope of its sentencing discretion and responsibility. (See, e.g., *Caldwell, supra,* 472 U.S. 320, 328-329 [86 L.Ed.2d 231, 246].) We disagree. The comments made by the prosecutor merely presented the case in aggravation as overwhelming and the case in mitigation as insubstantial, and did not, as defendant claims, stress the mandatory nature of the death penalty or lead the jury to believe that the responsibility for determining the appropriateness of death rested elsewhere. In light of the arguments of both the prosecutor and defense, the jury could not have been misled regarding its

sentencing responsibility in determining whether death was appropriate in this case. (See *People* v. *Miranda* (1987) 44 Cal.3d 57, 104, 112 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1182 [259 Cal.Rptr. 701, 774 P.2d 730].)

In turning to our second concern in *Brown, supra,* 40 Cal.3d 512, the record shows the jury understood that it was responsible for deciding for itself whether death was the appropriate punishment. (*Guzman, supra,* 45 Cal.3d at p. 959.)

The prosecutor repeatedly told the jury to ascribe what weight it deemed appropriate to the relevant factors and to determine, based on these factors, what penalty was appropriate. He stated: "Follow the rules that the court gives you and make the decision that way, and if you do that, if you do that you can't go wrong. You're not going to be led astray by one or another emotional pitch or something of that nature. [¶] Just look at the evidence and make a decision based on it."

During the course of defense counsel's closing argument, he told the jury: "Now, because of the nature of this case you must have many thoughts going through your head, but having reached the verdict you did your primary concerns are protecting society and fashioning a just and appropriate verdict."

In light of the above arguments, we cannot agree that the jury was misinformed about its role in ascribing weight to the relevant factors and deciding, based on these factors, the appropriate penalty.[24]

### 2. *Factor (k) "Error"*

The jury was given an "expanded [section 190.3,] factor (k)" instruction similar to the one prescribed in *People* v. *Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813]. The jury was directed to consider "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any other factor proffered by the defendant as a factor in mitigation of the penalty, *including his character.*" (Italics added.)

---

[24] We also reject defendant's argument that the verdict forms used by the court required the jury to use a mechanical, mandatory process in fixing penalty. The forms merely repeat to the jury that if it finds aggravating circumstances outweigh mitigating ones, the penalty is death; conversely, the forms state that if mitigating circumstances outweigh aggravating ones, the penalty is life without possibility of parole. Defendant has failed to show us how such routine forms could have misled the jury in its deliberation process.

 Defendant claims that prosecutorial argument misled the jury into believing that it could not assign mitigating weight to defendant's character evidence. We conclude, however, that a reasonable jury would not have been misled about its duty to consider defendant's mitigating character and background in determining penalty.

In addition to the instruction noted above, the court also instructed the jury: "In your deliberation you may consider pity, sympathy and mercy for the defendant in deciding the appropriate penalty. However, you may not be governed by mere conjecture, prejudice, or public opinion." We believe that by instructing the jury both under the "expanded factor (k)" and "sympathy" language above, the court adequately informed the jury that it could consider defendant's character evidence in mitigation.

Moreover, as in our *Brown* discussion above, any doubt about the jury's understanding is dispelled by both counsel's arguments. The prosecutor told the jury that the instruction gave it "some basis upon which to reduce the seriousness of the offense . . . ." After viewing the record as a whole, we are satisfied the prosecutor's argument simply informed the jury that it could consider and then reject defendant's "character" evidence as a mitigating factor or afford it little weight in determining the appropriate penalty. (*People* v. *Odle* (1988) 45 Cal.3d 386, 419 [247 Cal.Rptr. 137, 754 P.2d 184], and cases cited.) In addition, defense counsel, after describing his bleak background as an orphan "passed from family to family to family . . . probably subject to some abuse," told the jury that it could consider sympathy and pity for the defendant. Under these facts and in light of defense counsel's arguments, we cannot conclude that the jury was misled about its duty to consider, as mitigating, evidence of defendant's character.

## D. *Asserted Prosecutorial Misconduct*

In *Boyd, supra,* 38 Cal.3d 762, 772-776, we held that "the prosecution's case for aggravation is limited to evidence relevant to the listed factors exclusive of factor (k) [of section 190.3]—since that factor encompasses only extenuating circumstances and circumstances offered as a basis for a sentence less than death—while the defense may present evidence relevant to any listed factor including (k)." (*Id.* at pp. 775-776; see *People* v. *Howard* (1988) 44 Cal.3d 375, 438 [243 Cal.Rptr. 842, 749 P.2d 279].) The prosecution may nonetheless, on rebuttal following defendant's presentation of factor (k) evidence, introduce evidence "tending to 'disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)" (*Boyd, supra,* 38 Cal.3d at p. 776.) Defendant asserts the prosecutor's comment to the jury—that defendant's character evidence

"gets a check mark on the aggravation side"—constitutes reversible error under *Boyd.*

Our review of the record reveals, however, that the prosecutor's comment was made primarily under the aegis of section 190.3, factor (b), and on rebuttal following defendant's lengthy presentation of factor (k) ("good character") evidence. Because such evidence was admissible, even under *Boyd,* we find the prosecutor's comment did not constitute prejudicial error.

### E. *Victims' Character Evidence*

■ Defendant complains that the prosecutor's references to the victims during closing argument amounted to "victim impact" or character evidence that has been ruled inadmissible by the United States Supreme Court. (See *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207]; *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529].) *Gathers* makes it clear that comments regarding the victim's character or background made in order to elicit the sympathy or pity of the jury are inadmissible. *Booth* precludes evidence of the impact of the victim's death on his or her family. Both cases held that such evidence is irrelevant to a defendant's decision to kill and to the jury's decision on the appropriate sentence.

Defendant specifically objects to the following comments made during the prosecutor's summation. "You will get the sympathy and pity type . . . arguments like I said at the outset, this kind of a case certainly shouldn't be decided on the basis of giving grades for oratorical speaking. It should be decided on what happened here, on what the factors are." He then asked the jury: "Put yourself in the victims' shoes for a minute. That might be a little difficult since it is hard to think of doing something so stupid as to agree to go out to the desert to be photographed in the nude." The prosecutor also argued: "What huge offense that is, and then on top of that, what does it do to that person's family? This is a tragedy, not just for the person you killed, but the family and society. . . . And in this case this guy likes to deal with two victims at a time. We are not talking about one life, one family. We are talking about two."

Defendant claims that the above comments require reversal. We disagree. In our view, neither *Booth* nor *Gathers* bars comments on the crime from the victims' perspective, or brief references to the victims or their families. (*Booth, supra,* 482 U.S. at p. 507, fn. 10 [96 L.Ed.2d at p. 451]; see also *People* v. *Lewis, ante,* 262, at p. 284 [266 Cal.Rptr. 834, 786 P.2d 892]; *People* v. *Carrera* (1989) 49 Cal.3d 291, 336 [261 Cal.Rptr. 348, 777 P.2d 121].) Moreover, our review of the record reveals that the prosecutor's

comments to the jury in this case merely emphasized the aggravating circumstances of the crime, namely, the inhumane nature of the violent acts inflicted on two victims, and implied that the victims were executed without provocation. The prosecutor's references to the victims were indeed far more fleeting than those made in either *Gathers* or *Booth* and reiterated what the jury already knew—that murder is a crime against the victims, their families and society. (*Lewis, supra, ante,* at p. 285.)

Even if we were to conclude that the prosecutor's comments violated the proscriptions of *Gathers* and *Booth,* we would find there was no error beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) In our view, the prosecutor's brief comments could not have diverted the jury from its task of determining the appropriate punishment.

F. *Failure to Delete Assertedly "Inapplicable" Aggravating Factors/Davenport Error*

Defendant asserts the court should have deleted from CALJIC No. 8.84.1 the assertedly "inapplicable" factors, and that it was error to read to the jury the entire statutory list of factors. We have addressed the identical claim in recent cases in which we have explained that the "presentation of the entire range of factors is necessary in order to allow the jury to decide for itself whether asserted factors are present on the record before it, and to weigh those factors accordingly." (*Guzman, supra,* 45 Cal.3d 915, 965; see *Ghent, supra,* 43 Cal.3d 739, 776-777.)

Nonetheless, defendant contends the prosecutor emphasized, to defendant's prejudice, the assertedly "inapplicable" statutory factors because he used a chalkboard to outline each factor and essentially "checked off," under aggravating, each factor for which evidence in mitigation was absent.

In *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861], we held that "in the future" prosecutors should refrain from arguing that the absence of any given factor could constitute an aggravating factor. As in *Ghent,* however, the present case was tried before *Davenport* was decided and, in any event, our review of the record shows that a reasonable jury could not have been misled here.

As we stated above, the jury was told that aggravating factors were strictly limited by statute, must be proved beyond a reasonable doubt, and could be considered only if applicable. Here the jury was adequately informed of its sentencing responsibility and of the factors to consider in its

sentencing determination and, as noted, it received the admonition to consider only "applicable" factors. Moreover, on rebuttal, defense counsel emphasized the admonition. Initially, he told the jury that he disagreed with the prosecutor's interpretation of some of the factors as aggravating. Counsel then explained to the jury that "the instruction also says you can consider these factors, and it has a small phrase, prepositional phrase, 'if applicable.' [¶] What this means is if you find one of these categories doesn't fit into these factors, you are not to regard it. It doesn't mean it is an aggravating factor." We conclude there is no reasonable possibility that the prosecutor's assertedly improper argument influenced the penalty verdict. (See *Hamilton, supra*, 48 Cal.3d 1142, 1184-1185; *People v. Brown* (1988) 46 Cal.3d 432, 456 [250 Cal.Rptr. 604, 758 P.2d 1135].)

G. *"Double Counting" of the 1977 Crime*

 Defendant asserts the prosecutor misled the jury by arguing that evidence of the prior 1977 crime could be used to show aggravation in the present crime under section 190.3, factor (a) (circumstances of the crimes found at the guilt phase), as well as under factor (b) (prior violent criminal acts) (*People v. Miranda, supra*, 44 Cal.3d 57, 105-106.) Defendant contends that such "double counting" left the jury with little or no discretion in its penalty determination.

Although we agree with defendant that factor (b) evidence pertains only to criminal activity other than the crimes for which defendant was convicted in the present proceeding, we cannot, on this record, conclude that the jury understood that the 1977 prior crime came within the guilt phase crimes. Neither the judge nor the prosecutor told the jury that it was to consider the past crime as a circumstance of the present crime, and we are unpersuaded by defendant's argument that the jury was so misinformed. (See *Miranda, supra*, 44 Cal.3d at p. 107.)

H. *Age as Aggravating Factor*

 Defendant also notes that the prosecutor told the jury that defendant's age (56) should be considered an aggravating factor because "this is a responsible, mature adult, ladies and gentlemen, somebody who should know better. Somebody who is mature and who thinks in a mature and meaningful fashion." We have stated that age should not "of itself" be considered an aggravating factor. (*Ghent, supra*, 43 Cal.3d at p. 775; *People v. Rodriguez* (1986) 42 Cal.3d 730, 798 [230 Cal.Rptr. 667, 726 P.2d 113].) Recently, however, we have held that "in statutory sentencing [section 190.3,] factor (i) [age] is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might

reasonably inform the choice of penalty. Accordingly, counsel may argue any such age-related inference in every case." (*People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].)

Our review of the record reveals the prosecutor was placing more emphasis on defendant's maturity or sophistication, than on the lack of a mitigating factor. Accordingly, we find no error.

## I. Counsel's Competence

Defense counsel failed to object to, or to request an admonition regarding, many of the foregoing claims of prosecutorial "error." (See *People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) Defendant now asserts trial counsel's failure to object to the argument indicated trial counsel's incompetence. We have previously held, however, that mere failure to object to argument seldom establishes counsel's incompetence. (*Ghent, supra*, 43 Cal.3d 739, 772; *People* v. *Frierson, supra*, 25 Cal.3d 142, 158.) Here, we find the above instances of prosecutorial argument, to the extent they involved any error, establish neither unreasonable performance on the part of trial counsel, nor do they establish prejudice. We thus reject the claim of ineffective trial counsel.

## J. Adequacy of the Section 190.4, Subdivision (e), Hearing

Following the verdict of death, the court heard defendant's automatic motion for modification of the verdict. Section 190.4, subdivision (e), provides: "In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in section 190.3." The record makes clear that the court recognized and fulfilled its statutory duty to make an independent determination whether the jury's verdicts and findings were contrary to the law or evidence presented. Nonetheless, defendant attacks the court's ruling on the bases that the court: (i) erroneously considered defendant's age as aggravating, and (ii) improperly considered the probation report from the Orange County probation department. The latter report included information taken from police files (e.g., statements by detectives working on the case that defendant had probably killed other young girls), and "victim impact" statements. (See, e.g., *Gathers, supra*, 490 U.S. 805, __ [104 L.Ed.2d 876, 878]; *Booth, supra*, 482 U.S. 496, 502 [96 L.Ed.2d 440, 448].)

Read in the context of the entire record, we conclude the court's reference to defendant's age was a permissible comment on defendant's maturity and sophistication. (See, e.g., *Lucky, supra*, 45 Cal.3d at p. 302.) In addi-

tion, although we agree with defendant that his probation report was not relevant to the court's determination of defendant's application for modification of penalty under section 190.4, subdivision (e), we find any error nonprejudicial in this case. (See *People* v. *Williams, supra,* 45 Cal.3d 1268, 1329.) As we recently stated in *Adcox, supra,* 47 Cal.3d at page 274: "absent evidence in the record to the contrary, we must assume that the court was not improperly influenced by the report in ruling on the application."

In referring to the probation report, the court merely stated for the record: "Let the record reflect the court has received and considered the probation report from the Orange County probation department." The court did not indicate that it relied on either the report as a whole, or on any evidence regarding the effect of the murders on the victims' families. Thus, we conclude the court's fleeting reference to the probation report here did not demonstrate any improper influence exercised by the court in its decision. In fact, the record reveals that the court reviewed the evidence within the framework of the statutory factors set forth in section 190.3, and made its own independent findings that the aggravating circumstances outweighed the mitigating ones in this case. (See also *People* v. *Lang* (1989) 49 Cal.3d 991, 1044 [264 Cal.Rptr. 386, 782 P.2d 627] [trial court's consideration of victim's impact evidence did not affect ruling denying modification]; *Adcox, supra,* 47 Cal.3d 207, 273.)

### K. *Disproportionality of Sentence*

Defendant claims that the court erroneously failed to instruct the jury that the grant of immunity to Hernandez could be considered by the jury as a reason for not imposing death. He also asserts that because Hernandez harbored an intent to kill when he acted as an accomplice, defendant's sentence is arbitrary and disproportionate under the Eighth Amendment and article I, section 17 of the California Constitution. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 449 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410, 423-429 [105 Cal.Rptr. 217, 503 P.2d 921].)

We find these contentions meritless. Defendant was found guilty of the murders of Kreuger and Jones. The evidence indicated that Hernandez was not an active participant in the murders, unlike defendant, who was also the initiator of the acts. In light of the differences in their circumstances and involvement, defendant cannot assert that his punishment was disproportionate to his individual culpability. (See *Howard, supra,* 44 Cal.3d at pp. 444-445.) Nor can defendant show his sentence otherwise violates the *Dillon/Lynch* requirements. (See *Allen, supra,* 42 Cal.3d 1222, 1285-1286.)

## L. *Constitutionality of 1978 Death Penalty Law*

Defendant contends the 1978 death penalty law violates the Eighth Amendment's proscription of arbitrary sentencing procedures because it fails to provide adequate safeguards to ensure against an arbitrary death sentence. He also argues the 1978 law is unconstitutional in various other respects. We have considered and rejected each of his federal claims in recent opinions. (*Brown, supra,* 46 Cal.3d at p. 461; *People v. Rodriguez, supra,* 42 Cal.3d 730, 777-779.)

## M. *Cumulative Effect of Errors*

■ Defendant asserts that the cumulative effect of the penalty phase errors requires reversal of the judgment. To the extent that we have found any errors, however, we do not believe that they raise a realistic possibility that the jury might have reached a more favorable result had such error or errors not occurred. (*Brown, supra,* 46 Cal.3d at p. 463.)

The judgment of death is affirmed.

Panelli, J., Eagleson, J., Kennard, J., and Low (Harry W.), J.,* concurred.

MOSK, J.—I concur in the judgment. After reviewing the record, I can find no error requiring reversal.

I write separately to state clearly what I believe to be the proper method of analysis on appeal for a claim that the trial court erred by denying a motion for change of venue under Penal Code section 1033 (hereafter section 1033). Our opinions have at times been somewhat ambiguous on this point, appearing to conflate the logically separate questions of whether error was committed and, if so, whether reversal is called for. (See, e.g., *People v. Williams* (1989) 48 Cal.3d 1112, 1125-1126 [259 Cal.Rptr. 473, 774 P.2d 146]; *People v. Adcox* (1988) 47 Cal.3d 207, 231 [253 Cal.Rptr. 55, 763 P.2d 906]; *People v. Balderas* (1985) 41 Cal.3d 144, 177 [222 Cal.Rptr. 184, 711 P.2d 480]; *People v. Harris* (1981) 28 Cal.3d 935, 948-949 [171 Cal.Rptr. 679, 623 P.2d 240] (plur. opn.).) In my view, the issue should be addressed as follows.

Section 1033 provides in relevant part that "the court shall order a change of venue," "[o]n motion of the defendant, to another county when it

---

*Presiding Justice, Court of Appeal, First Appellate District, Division Five, assigned by the Chairperson of the Judicial Council.

appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (*Id.*, subd. (a).)

When a defendant claims on appeal that a ruling denying a change-of-venue motion was erroneous, the first question, obviously, concerns whether the ruling was in fact such. The relevant inquiry is: Was there a reasonable likelihood that a fair and impartial trial *could not be had* in the county? This inquiry, of course, focuses on the ruling itself and the record on which it was made. It does not look to subsequent matters, such as the voir dire of prospective jurors.

The second question—which must be resolved if error is found—concerns whether reversal is required. The relevant inquiry then becomes: Is there a reasonable likelihood that a fair and impartial trial *was not in fact had* in the county? This inquiry may consider pertinent matters subsequent to the challenged ruling. Only if the answer is affirmative must reversal be ordered.

In this case, I agree with the majority that the court's denial of defendant's motion for change of venue was not erroneous, and was certainly not reversible. I also agree with them that no other error requiring reversal appears. Accordingly, I concur in the judgment.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied June 21, 1990, and the opinion was modified to read as printed above.